## ARMOR GEORGE v. ST LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

**In Banc, February 2, 1910.**

1. **NEGLIGENCE: Evidence: Rules of Railroad Company: Distance of Building From Track.** Where plaintiff, an engineer in charge of a moving railroad locomotive, got down on the steps of the tender to locate a flat wheel, and while there was struck by a private house four feet from the rails, it was not error to permit him to introduce in evidence a rule of the company, which all engineers were required to know, declaring that "all buildings, erected by private corporations or parties, should not be located nearer than six feet from the nearest rail." Said rule was notice and assurance to him that he had at least six feet of safety in which to operate his train,

and there is no difference in principle whether the house was built by the company on its right of way or whether it was a private house within four feet of which the company laid its rails. The engineer had the right to assume that defendant company had performed its duty and placed the track at a reasonably safe distance from the house, until he had been warned of its dangerous proximity.

2. ———: ———: Time-Table: Warning as to Dangerous Bridges: No Warning as to House. Where the railroad time-table, which every engineer was required to carry and which the engineer had with him at the time he got down on the tender's steps to look for a flat wheel and was struck by a house situated four feet from the rail, in a foot-note named certain bridges that "will not clear to a man on side of car," but did not mention the house, it was competent to admit it in evidence. It could not be held to be competent only as a warning of dangerous bridges. The fact that it did not mention the house made it competent as an assurance to the engineer that the house was not dangerously near to the track.

3. ———: ———: ———: Warning After Accident That Place is Dangerous: Harmless Error. Where plaintiff, an engineer in charge of a moving locomotive, got down on the steps of the tender to locate a flat wheel, and was struck by a house four feet from the rail, it was not reversible error to permit plaintiff to introduce in evidence the foot-note to a time-table issued after the accident, which recited that the house would "not clear a man on side of car or engine." Its admission was error, in that it ordinarily is immaterial, and in certain situations prejudicial, to show a change in the conditions after the accident; but it was not prejudicial for the reason the distance between the rail and the house had remained the same from the date of the accident to the time the time-table was issued. And the error being harmless, the judgment for plaintiff cannot, under section 865, Revised Statutes 1899, be reversed because of it.

4. ———: Contributory: Imputed Knowledge of Distance of Dangerous Structure. An engineer is not to be charged with knowledge of the dangerous proximity of a building to the track by the fact that he had for years prior to the accident run a train thereon daily in daylight. It is a matter of common knowledge, of which courts will take judicial notice, that all men do not possess the same faculty for estimating distances; and where the testimony is that the engineer had never measured the distance between the track and the house, and that his attention had never been especially called to its dangerous proximity, and that it is difficult for any one while riding on an engine to judge of the distances from the track

. of near-by structures, it becomes a matter for the jury to determine whether or not he was guilty of contributory negligence in getting down on the steps of the tender, while the train was moving, to discover a flat wheel, it being a part of his duties to discover such wheel.

5. ———: ———: Choosing Dangerous Way: Locating Flat Wheel: Additional Delay. If the conditions are such that the safer way cannot be used, the law permits the pursuit of the dangerous way. So that where the engineer and fireman tried to locate a flat wheel by observation from the engine, but failed; and when the train reached the next station, the engineer made a careful inspection, by both looking and running his hand around the wheels, and again failed; and the testimony is that the surest and usual way for locating a flat wheel, is for the engineer, while the train is in motion, to put one foot upon the steps of the tender and the other upon its gang way, and grasp the handholds with his hands, and while in that position watch the wheels and determine the defective one by seeing the journal box bounce up and down as the flat place on the rim of the wheel strikes the rail, and he pursued that course, when to have done otherwise meant delay, it is for the jury to determine whether he exercised the care of a reasonably prudent man in choosing this dangerous way.

6. ———: Assumption of Risk. Unless the injury received by the servant was incidental to some risk assumed by him, he will not be debarred a recovery by the doctrine of assumption of risks. He never assumes the risk of injuries occasioned by the carelessness or negligence of his master. The master is required to furnish his servant a safe place in which to work, and if the servant's injury results from that failure the master is liable. Where the evidence tends to show that defendant railroad maintained its tracks for years at a distance of only four feet from a house, and its engineer, while in the performance of his duties, was struck by said house, and the jury have found that the place was dangerous and that the company had knowledge of the fact and the engineer did not, the finding is conclusive upon the question of the engineer's assumption of the risk.

7. ———: Contributory. Before the court or jury can charge the engineer of a moving train with contributory negligence in getting down on the steps of the tender and looking under to discover a flat wheel, they must be satisfied from the evidence that he either knew, or by the exercise of ordinary care might have known, that the building by which he was struck was near enough to the track to strike him while in that position.

Appeal from Cape Girardeau Court of Common Pleas.
—*Hon. Benj. F. Davis,* Judge.

AFFIRMED.

*W. F. Evans* and *Moses Whybark* for appellant.

(1) The plaintiff in his petition alleges that he heard the noise of a flat or defective wheel in his train and knew such defect to be dangerous to his train. This was an admitted fact, and the court erred in permitting the plaintiff to show that the engine operated by plaintiff was not disabled. It has been the law of Missouri for nearly fifty years that a party cannot be permitted at the trial to contradict the facts set up by his pleadings and this testimony contradicts such facts. Bruce v. Sims, 34 Mo. 246; Capitol Bank v. Armstrong, 62 Mo. 59; Wilson v. Albert, 89 Mo. 537; Knoop v. Kelsey, 102 Mo. 291; Bensieck v. Cook, 110 Mo. 173; Railroad v. Iron Works, 117 Mo. App. 152. The plaintiff having admitted he knew the wheel was flat and that it was dangerous to his train, he had but one duty to perform, as was shown by all the evidence, and that was to stop his train at once and discover its condition, which he failed to do and assumed the dangerous position after he had full opportunity at the station of Commerce, but passed by the same without making an examination, or making any report concerning it. (2) There is no possible excuse for his act. He had many ways which were safe to discover the condition of the wheel, but instead, voluntarily selected the most dangerous position possible on his engine, and that in the most publicly traveled street in the town, and on the side of the building, the location of which he was bound to be familiar with. Moore v. Railroad, 146 Mo. 572; Sparks v. Railroad, 31 Mo. App. 111; Hurst v. Railroad, 163 Mo. 309; Smith v. Forrester-Nace Box Co., 193 Mo. 715; Edington v. Railroad, 204 Mo. 61; Montgom-

ery v. Railroad, 109 Mo. App. 88; Railroad v. Hamlin, 10 L. R. A. (N. S.) 881; Demko v. Carbon Hill Coal Co., 69 C. C. A. 74; Railroad v. Jones, 95 U. S. 439. (3) He took the position in the most public street in the town, in violation of his duty, and at the time he did so he had absolute charge of the movement of the train, and was bound to know the location of the building, and his conduct bars his right to recover. Hulett v. Railroad, 67 Mo. 239; Hurst v. Railroad, 163 Mo. 309; Elliott v. Railroad, 204 Mo. 1; Moore v. Railroad, 146 Mo. 572. (4) The court erred in admitting the Time-table No. 12, and other evidence to show that defendant failed to warn its employees of the danger of the building. He was an experienced engineer, and had operated locomotives on that road for over three years, and for two and one-half years before he was injured he passed the building every day in daylight as an engineer on a passenger train, and averaged, as he testified, twenty-eight days in each month. He required no warning. The defendant was not required to warn him as to the location of the building. Smith v. Forrester-Nace Box Co., 193 Mo. 715; Nugent v. Kauffman Milling Co., 131 Mo. 241; Herbert v. Mound City Boot & Shoe Co., 90 Mo. App. 305; King v. Morgan, 48 C. C. A. 507. (5) Under these facts he was bound to know of its location. It was so glaring and obvious that he could not help but see it, and his opportunity to observe it under the facts is knowledge. Porter v. Railroad, 71 Mo. 66; Keegan v. Kavanaugh, 62 Mo. 230; Hulett v. Railroad, 67 Mo. 239; Kelsay v. Railroad, 127 Mo. 375; Harff v. Green, 168 Mo. 308; Railroad v. Johnson, 16 C. C. A. 317; Rains v. Railroad, 71 Mo. 164; Furnes v. Railroad, 129 Mo. 41. (6) He assumed the risk. The danger, if any, existed when he entered the service, and was not placed there afterwards. Charlton v. Railroad, 200 Mo. 435; Blundell v. Mfg. Co., 189 Mo. 559; Brady v. Railroad, 206 Mo. 527; Mathis v. Kansas City Stock Yards, 185 Mo. 444;

Roberts v. Mo. & Kan. Tel. Co., 166 Mo. 378; Nugent
v. Kauffman Milling Co., 131 Mo. 245; Junior v. Mo.
Elec. Light & Power Co., 127 Mo. 83; 1 Labatt on Mas-
ter & Servant, p. 141, sec. 55. (7) The plaintiff was
guilty of such negligence that the court ought not to
have submitted the case to the jury on that account. He
knew of the building when he took the position on the
side of the locomotive. Knorpp v. Wagner, 195 Mo.
637; Smith v. Forrester-Nace Box Co., 193 Mo. 715;
Doerr v. St. L. Brewing Assn., 176 Mo. 547; George v.
St. L. Mfg. Co., 159 Mo. 333; Loring v. Railroad, 128
Mo. 349; Fore v. Railroad, 114 Mo. App. 551; Evans
v. Railroad, 178 Mo. 508; Sparks v. Railroad, 31 Mo.
App. 111; Hulett v. Railroad, 67 Mo. 239; Holmes v.
Bradenbaugh, 172 Mo. 53; Sissel v. Railroad,
214 Mo. 515. He placed himself in a danger-
ous position when he had charge of the movement of
the train, and had other ways to safely perform the
service he undertook to perform. Montgomery v. Rail-
road, 109 Mo. App. 88; Moore v. Railroad, 146 Mo. 572;
Hurst v. Railroad, 163 Mo. 309; Hulett v. Railroad;
67 Mo. 239; Elliott v. Railroad, 204 Mo. 1. And in vio-
lation of the rules of the company, which he had with
him when he was injured, and with which he was per-
fectly familiar. Francis v. Railroad, 110 Mo. 387;
Schaub v. Railroad, 106 Mo. 230; Railroad v. Kane,
118 Fed. 230; Railroad v. Dewees, 82 C. C. A. 190;
Grattis v. Railroad, 153 Mo. 380. He had no right to
permit his mind to become so engrossed as to become
heedless of danger, and not take proper precaution.
Clancy v. Railroad, 192 Mo. 615. Nor will his forget-
fulness of the position of the building excuse his con-
duct under the facts of this case. 1 Labatt on Master
and Servant, p. 675, sec. 281; Bartley v. Railroad, 148
Mo. 124; Holwerson v. Railroad, 157 Mo. 242. (8) The
court erred in admitting in evidence Time-table No.
14, because it went into force after plaintiff was in-

jured, and could have no effect except to prejudice the jury against defendant. Hipsley v. Railroad, 88 Mo. 348; McHaney v. Railroad, 108 Mo. 191; Alcorn v. Railroad, 108 Mo. 81; Railroad v. Cartlege, 116 Ga. 164. (9) The court erred in permitting the plaintiff to offer in evidence the rules of defendant relating to structures, over the objection of the defendant. And also erred in refusing instruction 5 asked for by defendant construing the rules. These rules related to structures erected on the right-of-way, by the defendant or by its consent, and not to structures on private property as was the building in this case. It may have been a nuisance, but defendant had no control over it, and had no power to have it moved. Lucas v. Railroad, 174 Mo. 270; Railroad v. Moore, 82 S. W. 478. (10) The court erred in overruling the objection by defendant to the question asked the witness Dierson, by plaintiff, as to the method employed by him to discover a defective wheel, and also erred in permitting the plaintiff to prove the same facts by the witness Gill. Ruschenberg v. Railroad, 161 Mo. 70. (11) The court erred in overruling the objection by defendant to the question asked plaintiff, by his counsel, if he was in the discharge of his duty as a railroad engineer when he took his position on the step of the tender; and if it was necessary for him to make a report about the condition of the wheel. This evidence called for a conclusion by the witness, and the objections should have been sustained.

*Wilson Cramer* for respondent.

(1) In the case at bar the "pottery building" was erected 25 or 30 years before the railroad was built, and when the railroad was constructed, about the year 1895, the track was laid so close to the building that the nearest rail was less than four feet from it. The defendant company took charge of the road in this con-

dition in the year 1904, and continued to operate it without change up to the time of plaintiff's injury in January, 1906. (2) The engineer who located and built the road, Major James F. Brooks, was continuously afterwards in the employ of the different companies that controlled the road, and passed into the service of the present defendant company when it took charge, continuing in its employ up to August, 1905. (3) Plaintiff knew that the pottery building was one erected by private parties and fell within the provision of rule 333, that such buildings should not be nearer than six feet from the nearest rail. The rule itself was calculated to throw him off his guard. He had the right to assume that the company had complied with the rule and would not permit such a building to stand less than six feet from the nearest rail. Murphy v. Railroad, 115 Mo. 111. (4) It is urged that the building did not belong to the company and that it had no right to move it, but, while this may be true, it is equally true that there was nothing to prevent it from moving its track. The ordinance of the village of Commerce conferred the right to lay a track through the center of Water street, but the proof shows that it was located east of the center, and gets closer to the eastern margin of the street as it approaches New Madrid street on which the pottery building was located. (5) It is in evidence that it is difficult to tell from a moving train how close an object is to the track, and it was not the duty of plaintiff, in this instance, to make an examination. Murphy v. Railroad, 115 Mo. 111. To require the servant to determine the distance of objects near the track is to relieve the master from the obligation placed upon him by law to see that it is free and clear of dangerous obstructions. Charlton v. Railroad, 200 Mo. 413. (6) It is conceded by all of the expert witnesses that it was the duty of the plaintiff to locate the flat wheel and determine its condition. This is not disputed by anyone. And the preponder-

ance of the evidence shows that he assumed the right position when he got down on the step of the tender. It is "one of the ways" practiced by engineers, and plaintiff was, therefore, not guilty of contributory negligence. This danger arose from the nearness of the track to the pottery building. (7) Before descending from his seat-box, and getting down on the tender step, plaintiff set his throttle so the engine would run slowly, and left his fireman at his place, looking ahead and ringing the bell, as the fireman testifies he was doing. He was, therefore, violating no duty, even if this were a defense. (8) Time-table No. 14, introduced by plaintiff, was competent as an admission by defendant that the location of the road to the pottery building was too close for the safety of employees. But if its admission should be held to have been error, it was harmless error, in view of the fact, as it subsequently developed from defendant's evidence, that there was no dispute about the distance. Defendant's witnesses practically agreed with those of plaintiff that it was a little less than four feet. R. S. 1899, sec. 865; Bailey v. Kansas City, 189 Mo. 503.

WOODSON, J.—The plaintiff instituted this suit against the defendant in the Cape Girardeau Court of Common Pleas to recover the sum of twenty thousand dollars damages for personal injuries sustained by him through the alleged negligence of the defendant. A trial was had which resulted in a judgment for plaintiff for the sum of ten thousand dollars. After unsuccessfully moving the court for a new trial, the defendant duly appealed the cause to this court.

As no question is raised as to the sufficiency of the pleadings, which are in the ordinary form, they will be omitted from this statement of the case. Most of the facts of the case are undisputed and are substantially as follows:

The appellant at the time of the injury complained of operated a railroad from the city of St. Louis south through the village of Commerce, Scott county, Missouri, into the State of Arkansas. The road was located in Water street, which runs north and south through said village and is sixty feet in width. At the northeast corner of Water and New Madrid streets there stood near the street lines a two story building, known as the "pottery building." This building was erected upon private property some thirty years prior to the date of the injury, and was about twenty feet wide and forty feet long.

In the year 1893 the board of trustees of the village of Commerce enacted an ordinance which provides, among other things, the following:

"Section 1. That for the purpose of right-of-way, depot grounds and incline for a river railroad and transfer, the said village of Commerce hereby grants to Louis Houck, and the company he may organize, for the purpose of building a railroad from or near the city of Cape Girardeau, Missouri, to Morley, Missouri, *via* the village of Commerce, Missouri, the following real estate, rights and privileges, that is to say:

"First: The privilege to lay a track of a standard gauge railroad through the center of Water street, from the northern to the southern city limits, with privilege to build a switch east of said main track at or near the Grain Chain Mills and Commerce Grain Elevator, in such manner as not to be nearer than six feet of the east line of Water street between New Madrid and Washington streets."

Louis Houck, the grantee of said franchise, began the construction of the railroad therein mentioned in the year 1893, under the name of Houck's Missouri and Arkansas Railroad Company, and completed it in the year 1895. In the year 1902 the road was conveyed to the St. Louis and Gulf Railway Company, and in 1904 the latter conveyed it to the St. Louis, Memphis and

Southeastern Railway Company. Shortly afterwards, during the same year, it was sold to the St. Louis and San Francisco Railroad Company, the appellant, which was operating it in January, 1906, when respondent was injured.

The evidence discloses that the railroad track was not located in the center of Water street, as contemplated by the ordinance before mentioned, but east thereof, and at the point where it passes the pottery building the east rail thereof runs within a distance of forty-eight inches of the line of the west wall of said building. The location of the track had not been changed, as it passed through Commerce, from the time of its construction to the date of the injury.

James F. Brooks was the civil engineer who had charge of and constructed the railroad in question, and he remained with the road in that capacity through its various transfers, and remained in the employ of appellant until August, 1905. He testified that in locating the road he got just as close to the pottery building as he could; that the reason for locating the road so close to the pottery building was to avoid a ledge of rock about twelve feet thick located in and on the west side of Water street.

The depot at Commerce was located about seven hundred and fifty feet south of the pottery building on Water street, and each was plainly visible from the other.

On January 11, 1906, the date of the injury, and for some two or three years prior thereto, the respondent had been in the employ of appellant as a passenger locomotive engineer, running during day time over the road in question, and, consequently, passed in plain view of the pottery building some two or three times a day during those years.

The tender of the locomotive on which respondent was employed was eight feet and six inches in its extreme width, and the sides thereof extended over the

rails of the track one foot, ten and one-half inches, and the steps of the tender extended outward six inches further, and the distance from the top of the tender platform to the bottom of the handholds thereon is about eight or ten inches, and the handholds extend out some three or four inches and are two feet long. The distance, therefore, was about seventeen and one-half inches from the steps of the tender to the line of the pottery building, and about twenty-three and one-half inches from the western edge of the top of the tender platform as it passed said building.

Prior to the date of the injury, the attention of the proper officers of the road had been frequently called to the proximity of the road to the west wall of the building.

In the book of rules issued by the defendant company to its employees, one of which had been furnished to the plaintiff in this case, is rule No. 333, introduced by plaintiff, and it reads as follows: "No. 333. The tops of all freight platforms on side tracks for general use should be three feet ten inches above the top of the rail (conforming to the grade of the track), and the edge of the platform three feet six inches from the gauge side of the nearest rail.

"All buildings, corn cribs, cotton platforms and other structures, erected by private corporations or parties, and all stone, tie and timber piles for the company should not be located nearer than six feet from the nearest rail."

From time to time the company issued time-tables, copies of which it required its engineers to carry with them on their trips, and at the time of the accident plaintiff had with him on his engine time-table No. 12, which was then in force. In this time-table the following warning is given: "Following bridges will not clear a man on side of car: Whitewater, near Delta; St. Francis, at Hodges Ferry; Black River, at Poplar Bluff; Current River; Fourche River; Black River, at

Pocahontas." No mention is made of the pottery building.

About 12:25 p. m. on the 11th of January, 1906, while plaintiff was coming north with his passenger train, both he and his fireman, S. F. Maxwell, heard when three or four miles south of the station of Commerce what they took to be a flat wheel. At the request of plaintiff the fireman got down on the step on his side of the engine while the train was running, to see whether he could locate the wheel, but failed. When the train stopped at the station plaintiff himself got down from his engine and made an examination, but was unable to discover the defect.

On receiving the signal from the conductor to go ahead plaintiff started his engine, setting the throttle so the train would move slowly, and, leaving his fireman on his seat box looking ahead and ringing the bell, plaintiff got down on the step of the tender for the purpose of detecting, if possible, the flat wheel before his train got under full headway. He stood with his left foot on the tender step, his right knee on the deck of the tender, and, holding to the handhold with both hands, was looking back under the tender to observe the wheels and listen to the sound. While in this position, his train going six or seven miles an hour, he was struck and knocked off of his engine by the pottery building.

The remaining facts are disputed, and as counsel for appellant contend respondent did not make out a case for the consideration of the jury, it becomes necessary to set out the substance of the evidence bearing upon those facts.

With reference to respondent's knowledge of the surroundings of the place of the injury, he testified as follows:

"At the time I took my position on the tender step and stood as I did, I did not know how far that building was from the track. I had never been at that

place before, excepting on my trains, and had never stopped at that building. In passing I was just looking out there. There was a curve just north of that building, and in coming north I would be looking around that curve as far as I could see because there is a rock out there. I have never gone there any way except on a moving train. At the time I took the position with my left foot on the tender step and my knee on the tender tank (deck) and had hold of the grab irons and was looking under the tender at the wheels I did not know how far the building was from the rails.'' The reason why he took that position will be fully stated later.

He further testified as follows:

''I took that position so I could locate that defective wheel, as I wanted to report it when I came in, and find out while running what wheel it was, and I wanted to locate it while running at a slow speed. It was my duty to locate that wheel and report it to the round-house foreman at the Cape, so they could have a new wheel put on by the time the next trip was made. I could not locate that wheel from my seat on the engine. I got in that position so I could see the wheels. I wanted to find the defective wheel and to locate it while I was running. I would watch first one, then the other, while I was looking at them to see which it was. I determine while looking at a wheel whether it is defective or not, just that way. When the flat part or defective part strikes the rail the wheel will bounce, cause the journal box to bounce, and you can locate them that way when you cannot in any other way. When on the ground looking at it I could not see that defective wheel, probably because that place might have been on the rail or behind the brake shanks. There is not much however of the wheel you can see when the engine is standing.

''Q. Now, I will ask you to state whether a wheel that is in the condition you took this one to be needs attention and is or may be dangerous to the train?

George v. Railroad.

"A. It was my duty to look for that wheel that I took to be defective. There was no other place on my engine from which I could have located that wheel than this one that I took. . . . . That is the way an engineer proceeds to find a flat wheel in such cases. I usually locate them from the tender step. Most all engineers operating passenger trains use that method of locating a flat wheel. That is the best way. It is a better way than getting down and running your hand around the wheel. If locomotive engineers would employ the method of running their hand around the wheels to discover a flat wheel they would not be so apt to locate it as they would be looking at the wheels. I think a man could not feel a flat wheel as well as he could see it. A flat wheel is one that is worn out of round. It is not round. Probably got a sand hole in it. (Witness is handed a book of rules.) I had that book quite a while. I do not remember how long. I knew the rule that: 'In all cases of doubt or uncertainty the safest course must be taken and no risk run.' I also knew of the rule: 'Both conductor and engineer are responsible for the safety of their train and under conditions not provided for by rules must take every precaution for their protection.' I understand the rule that: 'Employees must be conversant with and obey the rules and special instructions. If in doubt as to their meaning, they must apply to proper authority for an explanation.' I also understood the rule that: 'Each employee is required to be responsible for his own safety, as well as to exercise the utmost caution to avoid injury to his fellows. Employees of every rank and grade are warned to see for themselves before using them that the rolling stock, machinery or tools which they are required to use are in a safe condition or that they are so put before using.' Rule 412 is in my book, as follows: 'The company does not require or expect its employees to incur any risk from which by the exercise of their judgment and by personal care

they can protect themselves, but enjoins upon them and demands them that they shall take time and use the means necessary to in all cases do their duties in safety.' The building was not on my mind at all. I never counted it a dangerous place, and therefore I was not looking out for it. I did not count it a dangerous place, because I did not think it would strike me at a place like that, the position I was standing in.

"Q. I will ask you to state whether you carried in your mind as you go along on the road—the railroad—the objects that you consider dangerous along the track. A. Yes, sir. I never forgot one in my life, I do not believe. I did not advise the conductor or anyone else about my locomotive being defective.

"Q. Was it necessary that you should from that point make any report about the condition of that wheel? A. No, sir."

Two witnesses, Bernard Gill, an engineer of sixteen or seventeen years' experience, testifying on behalf of plaintiff, and D. A. Chapin, the conductor on plaintiff's train at the time of the accident, introduced on the part of defendant, say that it is difficult to determine from a moving train the distance of objects near the track.

Gill says: "It would be a hard thing for an engineer riding on a train to estimate the distance of objects on the track while the train is in motion; he would have to have a good eye to tell how close an object is to the track."

D. A. Chapin states: "A man cannot tell from a moving train exactly how close an object is, but I can always satisfy my own mind whether I consider it dangerous and whether I am going to look out of the window or stay inside. I always warned passengers when I saw them put their heads out of the windows, as people frequently do, to caution them of the building being too close."

The evidence for respondent tended to show that it

was his duty to locate the flat wheel, to ascertain its condition, and report the same to the master mechanic when he reached the end of his run. Respondent is corroborated in that regard by two witnesses introduced by him, namely, Frederick Dierrsen and Bernard Gill, and by one of appellant's witnesses, N. S. Blennerhassett.

Frederick Dierrsen testified:

"Q. I will ask you what the duties are of an engineer in the employ of the defendant with respect to a flat wheel, if he discovers or thinks there is one in his train? A. It is the duty of an engineer to locate the wheel and examine its condition and determine whether it is dangerous or not. If the wheel is dangerous the engine must be cut out of the train, and must not be run on, if it is taking the chance on anyone's life which a wheel might be flat enough; if it is only a spot that is small and causes this pounding, it is not considered dangerous. . . . The engineer is required to make a report of the condition of the engine at the end of his trip to the roundhouse foreman or master mechanic in order that repairs may be made before the engine is ordered out again. The first thing to do to discover a flat wheel is to locate which wheel it is and after you find which wheel it is you can then examine as to what amount of flat spot there is on the wheel. If I do not happen to discover it by looking around the engine, I determine it by the engine moving; I got a clear view of the wheel. I cannot in all cases see the wheel from my seat box.

"Q. If you cannot see the wheel from there, what do you do, how do you proceed to discover it? A. Well, I often—from positions that I can see the wheel when moving, I sometimes get on the ground and have the fireman move the train slowly and locate it in that way or I get on the steps and look at the wheels in that way, if in a hurry. Another way to see the wheel when moving is to get on the step with his foot, and hold on to the side of the cab, or tank, to give him some position

so as to see under the tender to locate it in that way; or you can locate it by walking on the ground when the engine is moving slowly and determine which wheel it is by the way the boxes move up and down as the wheel pounds on the rails. The flat spot on the wheel may cause the wheel to bounce, which is on the journal, and the journal on the boxes, or a bent journal will also cause the boxes to bounce. While the train is in motion there is no other position an engineer can take on his tender or engine for the purpose of discovering whether there is a flat wheel on his engine or tender, than by standing on the tender step. I am still in the employ of the Frisco.''

Bernard Gill, a former employee of the defendant company, testified:

''When I was in the employ of the Frisco, operating the Gulf, if we had a flat wheel in our engine or tender, our duty was to locate them and see how bad they were, and when we got in we would write down in a book in the master mechanic's office that such and such an engine had a bad wheel and needed attention . . . . The engineer will hear a flat wheel pounding on the rails according to the different positions it takes on the rails. When the engineer hears the wheel in that condition in his train, tender or engine, he must first locate the wheel and see which wheel it is, and I would—I would go down off my seat box and if it is the engine tender I would look and see which one it was, you can tell from the jar without much trouble by looking under the tender. The wheel will jump off the rail when it comes over to the flat place, and you can easily see it, see what it is when it jumps and when you stop you can examine the wheel and see how it is defective; see how bad it is. To examine for a flat wheel I get down and look under the tender to see which side it is on. It would take you quite a while if the engine was standing still and the place was not where you could see it, one part of the wheel on the rail and

one part behind the truck. In that case I would get down on my step, if moving, and look under the tender and see if I could locate it. I would have to go down on the step and look under the tender. (Witness demonstrates.) The step is on the side of the engine or what we call the gangway, it is used for getting up on the engine. There is one on the engine and one on the tender; one a little lower down than the other. One handhold runs from the top of the tender to the bottom of it to where the woodwork begins. The other is on the engine on the cab. I would get in that position so as to see what wheel it was, both sections are clear to the sight when the wheel is moving. That saves lots of trouble. You can examine it if you know which one it is. It might be on the right side or the left. When the wheel is in motion, if it is a flat wheel, you can see the oil boxes jumping up. The wheels jump up and down. When I was in the employ of the Frisco operating the Gulf, if we heard a flat wheel in our engine or tender, our duty was to locate them and see how bad they were, and when we got in we would write down in a book in the master mechanic's office that such and such an engine had a bad wheel and needed attention. There is no other position about the engine or tender that I could assume or an engineer would assume to find the wheel when the train is in motion except the one I spoke of."

U. S. Blennerhassett, defendant's road foreman of equipment, testifying for defendant, said on cross-examination:

"I have tried to detect a flat wheel; it is one of my duties. It is my duty in riding these engines to report their condition to the master mechanic, and the duty of an engineer in that respect is along the same line as mine. If an engineer is running a train and discovers a flat wheel in his engine and tender it is his duty to locate that wheel at once and to report that fact to the roundhouse or proper person."

The record shows that some diversity of opinion was expressed by the engineers who testified as to whether plaintiff pursued the proper course in undertaking to locate the flat wheel, but the preponderance of evidence corroborates him in his statement that he did.

Blennerhassett continuing said:

"I think I have gotten down on the step of the tender while the train was running, but it is extremely dangerous from the fact that there are various things in maintaining a railroad that come so near that they will not clear a man in that position. It is dangerous of itself for a man to stand there, as he is liable to be thrown off. There are various dangers; one arises from objects near the road. I have known some other engineers to take the same position on the step. . . . When I, while acting as engineer, got out on the tender step, I certainly knew I was violating the rules. The oscillation of an engine is greater than that of the train behind it; I do not know what comparison to make, but it is materially and perceptibly greater. The speed of the train has an effect on the oscillation of the engine; it is greater running rapidly than slowly.

"Re-cross Examination: There is nothing in the book of rules strictly prohibiting a man from that one thing, getting down on the tender step. This book of rules is issued by the company for the government of the trainmen, and they depend upon it."

L. W. Moseley, an engineer of eleven years' standing, introduced by defendant, said, on direct examination: "The position of an engineer on a train passing through a village of six hundred people, where the track is on the main street of the town, is on the right-hand side of the engine on the seat box. His duties would require him to watch ahead for any obstacles or anything that might get on the track, and be prepared to stop his train, shut off his throttle, etc., and make application of his air-brakes. That is a rule. If a

locomotive engineer should be going through a place
of that kind and should leave his seat box, and go on
the side of his tender and lean out, and, instead of look-
ing forward should look backward, without advising
the fireman or doing anything with reference to the
movement of the train, I would not consider that he
was doing his duty, in the strict sense of the word.

"Cross-Examination:   Q.   But if his engine were
running slowly, and his fireman was there by the en-
gine, and the engineer believed that by getting down
on the side of his tender, he could locate a defective
wheel, would he be justified in doing it?"   A.   If he
thought that was the only way he could locate the trou-
ble, yes.

"Re-direct Examination:   The disabilities of an
engine are easily detected by the sound.   If an engine
were disabled or defective as to the wheels, had flat
wheels, a sound would emanate from that part of the
engine.   There are various ways to detect or examine
them.   One way would be to stop the engine and get
down and move the engine slowly.   You could look out
of the cab window on some class engines, and see the
tank wheels; or stand on the deck of the tank, and if
there was a continual jar there in the location of the
wheels, you would have reason to believe that there
was a flat wheel; or you could get down on the step and
look.   The appropriate way for safety is to stop.

"Re-cross Examination:   I would not expect an en-
gineer to locate a wheel on his tender by looking for-
ward.   He would look forward to find one on the truck.
He could tell from the way the sound emanated whether
the trouble was in the trucks or on the engine.   He
would not look ahead to see the tank trucks.   If he hears
a flat wheel on the engine or tender, there are various
ways to examine for it; one is to look out of the cab
window, and another is to stand on the deck of the tank.
You can tell by the vibrations.   Another is to get down
on the step.   I have done this; it is one of the ways;

you can see under the tank from the steps. If I know the wheel is dangerous, I would make a thorough inspection by getting off the engine. If I heard the sound of a flat wheel before I reached a station, and at the station I was unable to locate the flat wheel, and then should receive a signal from the conductor to go on, if I knew the engine was defective and not a safe proposition, I would not heed the signal of the conductor. If I examined the engine and could not discover the flat wheel, if I did not consider it serious, I would go on receiving the signal from the conductor."

N. H. Carle, who had been an engineer for thirty-odd years, testifying for defendant, said: "I should say it is not a practice among engineers skilled in their business to get down on the side of the tank in the manner indicated; everybody recognizes it as a dangerous position under any circumstances. I should consider it dangerous irrespective of there being obstructions on the side of the track, for the reason that while one is in that position, the least little step, jar or jump of the engine might throw him off in such a manner that he would get hurt, or he might lose his foot on the step. It is against the rules; I would consider it so. Irrespective of any rule adopted by the railroad company, I would say that it is a rule with locomotive engineers that that position is unsafe on a moving train.

"Cross-Examination: I believe I told you the other day that that position was dangerous because of objects along the track. I think that is what makes it so. The position of an engineer is dangerous at all times, and this position is particularly dangerous, in my opinion, from objects that are too near the track; that is what made it dangerous in this case. To the best of my knowledge George was not hurt by the jar of the engine, but was knocked off by the building. I consider that building too close to the track to be safe. I believe if George had leaned out of his cab window

far enough to see the journal boxes, that building would have struck him; would have caught his head. Don't believe I ever said anything to the master mechanic; we have been talking here recently. I have taken that position on the tender step and looked under the tender, but not many times. I have taken that position for different purposes, one was to see how hot a journal was. I was not satisfied with looking out the cab window. In some cases the position on the step was better; I could tell better by getting nearer to it than by looking out the cab window. Do not recall that I looked for anything else. Don't know that I ever took that position to look for a flat wheel. Don't know that being on the tender step instead of in the cab window is a better position to detect the defect; don't know that you could see the wheel any better. You could not see the journal boxes any better; the closer to the sound you get the more distinct it is. My examinations are generally made with respect to the sense of hearing and sight. An engineer is supposed to take notice of any unusual sound; he cannot ignore unusual noises. Sitting on the engine cab, I do not think you can see the tread of the wheels on the tender. . . George would not have been in any danger if the company had not had this building so close to the track; the only danger he was in was falling off. There is nothing, only so far as I have stated, in the rules of the company, or any other company, against a man taking his position on the tender step. He is to look out for himself, and not expose himself to unnecessary danger. There is no special reference to any position whatever, that he can take on his engine or tender, that I know of.

"Re-direct Examination: You can see the sides of the wheels from the engineer's seat in the cab.

"Re-cross Examination: From the cab you can possibly see one-third of the side of the wheel. On this particular engine you would have had to lean far enough out of the window for that building to hit you."

Respondent had his left hand and arm crushed, which necessitated, first, an amputation of the hand, and later, the amputation of the arm just below the elbow. He received many other serious wounds and bruises upon his head and shoulders which rendered him unconscious for several hours.

Respondent testified as follows regarding his injuries:

"I was knocked off by the old pottery building, just north of Commerce. I could not say where it struck me. That was the last thing I knew, only what I have heard people say. When I recovered consciousness I was in the hospital at Cape Girardeau. I do not remember anything from the time I was struck until I got to the hospital. It was two or three days before I remembered the least thing the first time. When I came to myself my left arm was cut off. They had not made final amputation, but had just taken my hand off. There were bones and flesh sticking out, bones sticking out through the flesh, and the doctor had it bandaged with gauze. My left shoulder was all bruised. My left eye was swollen, too. My head was shaved so they could sew up the wounds. Both shoulders were bruised; the left one was worse than the right. The condition of my mind was not good then. I do not suppose I could remember anything for two or three days. After I was hurt Dr. Frame attended me at the hospital and continued to attend me after my arm was amputated and bandaged up until I was finally well. He attended me about three months. My arm was amputated at St. Francis Hospital—three or three and one-half inches, probably, below the elbow; not over three and one-half inches. My left shoulder rose from the bruise and they had to slit it open, a place about an inch and a half or two inches long. It was a very deep place and they had to cut in deep, and for a long time they had to keep gauze packed in there to keep it open, and it was about two months before

that got well. It festered and discharged. I got so I could sit up some in about fifteen days, but then I was never out of bed entirely until along about in February, I believe. I would have to lay down and rest. Of course, I could get up and sit up, probably walk around, but I could not stay up long. My head and shoulder and arm hurt. It was two months before the stump of my arm healed up. I suffered pain in my head up to about three or four weeks ago, I presume. My head does not feel entirely right yet, seems as though circulation sometimes stops, feels dead on top, and I have to rub by head occasionally. At times I feel it yet.

"Q. I will ask you to state if your memory is as good as it was at first, or before you were hurt. A. No, sir, I do not believe it is.

"Q. How about the faculty of calculating—figuring? Has there been any change in that or not. A. I can't count like I used to could."

His physicians, three in number, corroborated the testimony of respondent as to the character and extent of his injuries.

The evidence also showed that respondent was about twenty-eight years of age at the time of his injury, and was earning about one hundred and sixty five dollars per month. The injuries he received disabled him from further performing the duties of a locomotive engineer.

Thereupon, at the request of respondent, the court, over the objections and exceptions of appellant, gave, among others, the two following instructions:

"2. And the court further instructs you that, if you shall find and believe from the evidence in this cause that the railroad track was in such close proximity to the building near the station of Commerce, known as the 'pottery building' as to endanger the lives and safety of the trainmen operating the trains on said road, and shall further find that the defendant had

knowledge thereof, or that the track had been in such position for such length of time that the defendant, by the use of reasonable and ordinary care might have known it, and you shall further find from the evidence that plaintiff, while in the discharge of his duty as locomotive engineer on one of defendant's trains, was struck by said building and knocked from his train and injured, then plaintiff is entitled to recover and your verdict should be for the plaintiff, unless you further find from the evidence that plaintiff knew at the time or by the exercise of ordinary care might have known, that said building was close enough to strike his body when assuming his position on the steps of the tender.

"3. The court further instructs the jury that a servant assumes the ordinary risks incident to his employment, but does not assume the risk caused by the failure of the master to perform his duty to the servant, and if in this cause you shall find from the evidence that the pottery building was dangerously close to the track of the defendant's railroad, that defendant knew it, or by the exercise of reasonable and ordinary care might have known it, and you further find that plaintiff, at the time of his injury was in the discharge of his duty, then plaintiff did not assume the risk arising from the nearness of said building, unless he knew, or by the exercise of ordinary care might have known, when he took a position on the steps of the tender, that said building was near enough to the track to strike him while in that position."

Such additional facts as may be necessary for a proper understanding of the legal propositions presented will be noted during the progress of the opinion.

## OPINION.

I. There are several questions presented by this record for determination regarding the action of the

trial court in the admission of testimony on the part of respondent over the objections of counsel for appellant. Logically, they should be disposed of before going to the merits of the case.

On cross-examination, the witness Chapin, the conductor in charge of the train on which respondent was injured and who was offered as a witness by appellant, was asked these questions, and he made the following answers thereto:

"Q. You ran the engine from there to Cape, did you not? A. I did.

"Q. Now, as a matter of fact, that engine was not disabled, was it? A. I ran the engine from Commerce to the shops and it was not disabled that I know of."

Counsel for appellant made the following objection to said evidence when it was offered:

The defendant here objected for the reason that his question was, "Did George say to him at Commerce or any other time before he left the station and before he gave the signal, that his engine was disabled," and he said, "No," and for the further reason that it is immaterial and incompetent because relating to a matter subsequent to the injury and contradicts any allegation of the plaintiff in his petition which is admitted by the answer.

The objection was overruled and defendant excepted.

In order to intelligently present this question, it is necessary to set out that part of the petition to which the objection refers, which is as follows:

"And plaintiff further states that on the 11th day of January, 1906, while he was coming north on said road with a passenger train attached to the engine of which he had charge, he heard the noise of a flat or defective wheel in his train, and knowing such defect to be dangerous to his train, plaintiff, on reaching the station of Commerce, descended from his engine while it was standing still, to make an examination, but was

unable to discover or locate the defective wheel. That thereupon, plaintiff, after starting his train to proceed to the city of Cape Girardeau, in order, if possible to locate said defective wheel by the sound, before his train should acquire full speed, kneeled down on the deck of his tender," etc.

This allegation was made by way of inducement, or to explain why respondent assumed the position he was in when struck by the building. The flat or defective wheel was not the proximate cause of the injury, nor is it so charged in the petition; but, upon the contrary, the petition states the injury was caused by the negligence of the appellant in maintaining and operating its trains in such close proximity to the pottery building as to knock him from the tender while performing his duty in trying to detect the flat or defective wheel, which by the rules of the company he was required to do and to report the same to the master mechanic upon reaching the end of his run. The testimony of this witness given upon direct examination is preserved in the record in narrative form, and not by questions and answers; and judging from the tenor thereof, evidently counsel for appellant was trying to show by this witness that respondent was guilty of contributory negligence in taking the position he was in when struck, for, among other things, the witness said: "Did not see him on the side of his locomotive. My duties called me in the coach. I did not know his engine was disabled." The witness made the latter statement twice on direct examination, and under that state of the pleadings and evidence counsel for appellant was contending that when respondent detected that one of the wheels of the tender was flat, it then became his imperative duty under the rules of the company "to stop the train at once and discover its condition," and having failed to do so, he was guilty of contributory negligence and assumed the risk of injury by continuing his run with the wheel in that condition, either of which

should prevent a recovery. So, reading the testimony in the light of what had previously transpired, it is evident that it was simply evidence brought out on cross-examination regarding the matters which had been stated by the witness on his direct examination, thereby showing that the engine was not dangerous in the sense in which counsel for appellant had undertaken to show. No one can read the petition and conclude therefrom that respondent was relying upon the flat wheel as the proximate cause of the injury; but, as before stated, the petition negatives any such idea and bases his right to a recovery upon the negligence of the company in operating its trains too close to the building mentioned.

Besides this, it would be an unreasonable construction of the rules of the company to hold that they require the engineer to stop his train wherever he might be upon discovering some trivial defect about his engine, such as this flattened wheel—so slight that it could not be detected by sight or touch, but only by vibration. It is common knowledge that a wheel may become slightly flattened at any time after the train leaves the roundhouse and while proceeding on its run; and for the engineer to abandon the trip until such a defect could be repaired, which could only be done at the roundhouse or at the machine shop, would be unreasonable and not justifiable under the rules of the company. Under such circumstances the rules of the company only require the engineer to locate the defect and report the same to the master mechanic when he reaches the end of his run. Of course, serious defects discovered upon any part of the engine or train might occur and call for such conduct on the part of the engineer, but, clearly, under the evidence disclosed by this record this defect was not of that character.

We are, therefore, of the opinion that the action of the court in admitting said evidence, under the circumstances, was proper.

.II.   Plaintiff next offered Rule No. 333, contained in the book of rules of the railroad company, identified by the plaintiff, which rule is as follows:

"No. 333.   The tops of all freight platforms on side tracks for general use should be three feet ten inches above the top of the rail (conforming to the grade of the track), and the edge of the platform three feet six inches from the gauge side of the nearest rail.

"All buildings, corn cribs, cotton platforms, and other structures, erected by private corporations or parties, and all stone, tie and timber piles for the company, should not be located nearer than six feet from the nearest rail."

The defendant objected to the introduction of this rule in this case, for the reason that the rule applies to the platforms and buildings erected on property belonging to the railroad company, and can have no application to buildings erected upon property belonging to private individuals and over which it has no connection or control; and under the admitted facts in this case, this building was not on the company's right of way, but upon private property.   This objection was overruled, and the defendant excepted.

Respondent was required to familiarize himself with the contents of the book of rules, of which No. 333 was one, and to pass an examination in regard thereto. The object of this rule was to prevent the agents and servants of the company from placing any building or other obstruction closer than six feet to the nearest rail, thereby keeping the track free from all obstructions so that the trains and the employees in charge thereof might pass in safety; and the only purpose the company could have had in requiring the trainmen (who had nothing whatever to do with the construction of said buildings, corn cribs, etc.) to familiarize themselves with said rule was to notify and assure them that they had at least six feet in the clear

on both sides of the track in which to operate the trains. If under that rule the agents of the company had constructed the old pottery building at the place where it was standing when it struck respondent, then, clearly, the company would have been guilty of negligence in so placing it; and for the life of me I am unable to see any difference in principle, in so far as the safety of the train and employees in charge thereof are concerned, whether the track was constructed within four feet of the building or the building within four feet of the track. The one would be just as dangerous to the train and the employees as the other, and, in my judgment, both would be a plain violation of the spirit of said rule. The rule was calculated to throw respondent off his guard and lull him into a sense of security. He had the right to assume, in the absence of notice to the contrary, that the company would not construct a building within six feet of the nearest rail, and that it would not construct or maintain its road nearer than that distance to a building constructed by some one else.

In the discussion of a similar question, in the case of Murphy v. Wabash Railroad Co., 115 Mo. l. c. 118, BLACK, P. J., in speaking for the unanimous court, said: "A railroad company is in duty bound to place its signal posts, telegraph poles, cattle guards, fences and other structures used in connection with the road at a safe distance from the track, to the end that they will not be dangerous to those engaged in operating its trains; for, considering the nature of the business, this is but ordinary care. It is not sufficient that such structures answer the purpose for which erected. In building them the safety of the servants in operating trains must be consulted. If it becomes necessary to place such structures so near to the track as to be dangerous to such operatives, then it is the duty of the company to warn them of the danger, so they can govern their conduct accordingly. In the first place, he [the plain-

George v. Railroad.

tiff, who was also an engineer] had the right to assume that the defendant had performed its duty and had placed the fence at a reasonably safe distance from the track, until he had information to the contrary, for it was no part of his duty to examine the fences to see how close they were to the track." That rule is supported by all of the authorities, and is based upon the doctrine that it is the duty of the master to furnish his servant with a reasonably safe place in which to work.

There was no error in admitting the rule in evidence.

III.   Counsel for respondent offered in evidence time-table No. 12 of the appellant company. Whereupon, counsel for the latter requested the former to state his purpose in offering the same. In reply, counsel stated that he offered it for the purpose of showing that the appellant gave warning to its trainmen of objects that are too near the track, and called special attention to those objects, and that nowhere is their attention called to the pottery building. Thereupon, counsel for appellant objected to the offer for the following reasons: "That this time-table was incompetent and irrelevant, and does not undertake to warn the employees against any dangerous objects other than bridges on the track, and does not undertake to warn them as to objects on the side of the track; and that said time-table and the testimony sought to be introduced by it are irrelevant and incompetent under the issues involved in the case. The objection was overruled, to which ruling the defendant excepted.

The time-table was then admitted in evidence, but the only part thereof material to this question is found in the following foot-note on page six thereof, to-wit:

"Following bridges will not clear a man on side of car:

"Whitewater, near Delta.

"St. Francois, at Hodges Ferry.

"Black River, at Poplar Bluff.

"Fourth Street (overhead), Poplar Bluff.

"Current River.

"Fourche River.

"Black River, at Pocahontas."

Literally speaking this foot-note only purported to give warning to the trainmen of dangers caused by the close proximity of the bridges mentioned therein; but is that the true and full meaning of the warning? We think not. The warning was given for the protection of the trainmen from injury by coming in contact with objects located or standing so near the line of passing trains that they would "not clear a man on side of car." Protection was the dominant idea of the warning, and attention was called to the bridges simply as so many menaces to their safety. A standpipe, tree or building located too near the tracks would be equally menacing; and the same duty which required and prompted appellant to give the warning as to the former also required it to give it as to the latter; and, knowing that fact, the engineer, in the absence of notice to the contrary, had the right to presume the company had discharged its full duty in that regard toward him. In other words, the mere fact that appellant gave warning as to the dangers incident to the close proximity of the bridges to the track would naturally lead the trainmen to believe no other danger of like character existed or threatened their safety, whether bridges, stand-pipes or other buildings. For what would be the sense in protecting the employees from bridges and then kill them by hurling them against a tree or building?

If the insistence of counsel for appellant is sound, then, if perchance some other bridge, not named in the time-table, had existed and had struck and injured respondent, still such time-table would have been inad-

missible in evidence, for the reason stated in the objection, that it "did not undertake to warn the employees against any dangerous objects other than the bridges named therein." Clearly, such a contention would be unsound, for the reason that naming some of the *dangerous* bridges and omitting others would naturally lead the employees to suppose none existed except those named; and the. same is true where only a part of the *dangerous* obstructions were mentioned in the warning, whether they be bridges or other structures. At any rate, such a warning was a fact or circumstance which should have been considered by the jury in determining the question on the part of the respondent.

The cases of Lucas v. Railroad, 174 Mo. 270, and Chattanooga Ry. Co. v. Moore, 82 S. W. 478, are not in point.

We, therefore, conclude that the court did not err in admitting such time-table.

IV.   Plaintiff next offered in evidence time-table No. 14 of the defendant company, marked exhibit "H."

Counsel for defendant requested the purpose of this offering. Counsel for plaintiff stated that the purpose. is to show the same thing as shown by the other time-table, and in addition to that, that on this time-table a warning is given about the old pottery building.

Defendant here objected for the same reason stated in the objection to time-table No. 12, and for the additional reason that this time-table was issued subsequently to the injury, and is not competent under the issues in this case, as it is a matter taking place subsequently to the injury and is irrelevant, and it is brought to prejudice the jury against the defendant, and is not relevant or competent under any issue in the case. This objection was overruled, to which ruling the defendant excepted.

What has been said in paragraph three regarding the admission of time-table No. 12 fully answers the first objection urged against the admission of time-table No. 14, and nothing further need be added here as to that objection.

But the second objection demands careful consideration. Technically the second objection was well taken, for the reason that the evidence should have been confined to the condition of things as they existed at the time of the injury, and ordinarily the condition of things as they existed at some subsequent time is wholly immaterial. This is borne out by the following cases: Hipsley v. Railroad, 88 Mo. 348; Mahaney v. Railroad, 108 Mo. 191; Alcorn v. Railroad, 108 Mo. 81.

In the first case a passenger sued the company for damages for personal injuries sustained by the derailment of the train on which he was riding. Several months after the accident the company repaired its road by putting in new ties and rails. At the trial the plaintiff offered evidence to show said repairs, which the court excluded on the objection of defendant. The plaintiff excepted to the ruling, and presented it to this court for review. In disposing of that question NORTON, J., on page 354, said: "The court did not err, either in refusing to allow plaintiff to show that several months after the accident defendant repaired its road by putting in new rails and ties in various places (Ely v. Railroad, 77 Mo. 34), nor in confining plaintiff's evidence to the condition of the roadbed at the place of and immediate vicinity of the accident and to its condition at the time of the accident." The other cases cited are of like tenor.

In the second case referred to, Judge GANTT correctly stated that such evidence was calculated to induce the jury to believe the repairs were made because defendant was conscious that the track was defective at the time of the injury. Such a conclusion could not, with any degree of certainty, be drawn from the

fact that the repairs were made six months after the injury, for the reason that the defective condition of the track may have occurred long subsequent to the date of the injury, and probably did, for it would be unreasonable to suppose the defendant would have its track in a dangerous condition for a period of six months. But the reason of that rule does not apply to the facts of this case, for the reason that there is no pretense but what the distance between the building and the track had remained the same from the date of the injury down to the date of the time-table in question. Under no circumstances could the jury have inferred or have been induced by the time-table to believe that the dangerous proximity of the road to the building was caused in any manner after the injury occurred. If the situation was dangerous to the employees operating the trains at the date respondent was injured, then it was dangerous at the date of the issuance of time-table No. 14; and if it was not dangerous at the former date, then it was not dangerous at the latter.

While, as before stated, the admission of this time-table was error, yet manifestly it was harmless and could under no circumtances have worked injury to appellant.

This error falls squarely within the meaning of section 865, Revised Statutes 1899, which provides that this court shall not reverse a judgment against the appellant or plaintiff in error unless it shall believe that error was committed by the trial court materially affecting the merits of the case.

We must, therefore, obey the mandate of that statute, and hold the error complained of to be harmless, as we have done many times before. [Bailey v. Kansas City, 189 Mo. 503.]

V. This brings us to the consideration of the merits of the case.

That respondent was injured in consequence of

being driven against the pottery building is conceded. Likewise is the seriousness of his injuries. In fact, appellant does not complain here that the verdict of the jury was excessive. But counsel for appellant, however, insist that he was guilty of such contributory negligence as should prevent a recovery for any sum. They insist that because respondent passed this building on his engine daily for years, in plain view thereof, he must have had knowledge of the distance between it and the railroad track, as well as the danger incident thereto, threatening all trainmen; and consequently when respondent took the position on the side of the tender, indicated by the evidence, he thereby committed such an act of negligence that the law will deny him a remedy.

While it is true the evidence shows that respondent had, daily, for years, passed this building on his engine, in plain view thereof, it does not necessarily follow therefrom that he knew the distance between the passing tender and the building in question. It is common knowledge, of which the court must take judicial notice, that all men do not possess the same judgment as to distances. Some can judge distances with great accuracy, while others have but little idea as to such matters. In the case at bar respondent testified that he had never measured the distance between the track and the building, nor had his attention ever been specially called to it. That the only knowledge he had of the distance was that acquired by casual observation. He and several other witnesses, including two introduced by appellant, testified that it was quite difficult for any one to judge of distances while riding upon an engine, for the reason that the vibration and motion thereof materially interfere with one's vision while viewing objects from a moving engine or train.

What was said by Judge LAMM, in speaking for the court, in the case of Charlton v. Railroad, 200 Mo. l. c.

437, has peculiar application to the facts of this case, viz.: "A railway company is required to place its signal posts, cattle-guard fences, and other structures used in connection with the road at a safe distance from the track to the end that they will not be dangerous to its employees in operating the trains. Where the company has itself placed such structures so near the track as to be dangerous to its servants in the discharge of the duties assigned to them and an injury occurs from that cause without fault on the part of the servant injured, the liability of the company is fixed. It may be conceded that other courts have arrived at a different conclusion than that announced in the Murphy case, on a practically equivalent condition of material facts; but the doctrine of that case has never been criticised by this court, seems sound, and is strongly supported elsewhere. [Railroad v. McDade, 191 U. S. 64; Railroad v. Michaels, 57 Kan. 474; Railroad v. Thompson, 94 Ala. 636; Railroad v. Davis, 92 Ala. 300; Railroad v. Mansell, 138 Ala. 548; Central Trust Co. v. Railroad, 73 Fed. 661; Withee v. Railroad, 98 Me. 61; Railroad v. Thompson, 210 Ill. 226; Kelleher v. Railroad, 80 Wis. 584 (the doctrine of this case may not have been followed in a later one, Scidmore v. Railroad, 89 Wis. 188) ; Railroad v. Welch, 52 Ill. 183; Whipple v. Railroad, 19 R. I. 587.]"

In our opinion this contention of counsel for appellant is untenable; and under the disclosures made by this record the question of contributory negligence was properly submitted to the jury for determination.

VI.   It is also insisted that the trial court erred in submitting the case to the jury, for the reason that by going upon the side of the tender while it was in motion for the purpose of locating the defective wheel he violated the rules of the company, which, under the law, should prevent a recovery.

225 Sup—26

Our attention has been called to no such rule, and after a careful reading of this record we have been unable to find any such rule preserved therein. In fact, some of appellant's own witnesses testified that no such rule existed. This renders the cases of Francis v. Railroad, 110 Mo. 387; Schaub v. Railroad, 106 Mo. 74 and Grattis v. Railroad, 153 Mo. 380, and the other cases cited by counsel for appellant inapplicable to the facts of this case.

This insistence, therefore, must also be decided against appellant.

VII. It is next contended by counsel for appellant that the court erred in not sustaining the demurrer to the evidence, for the reason that the law and rules of the company required the respondent, where there were two ways of performing a dangerous duty, to select the one which was the least dangerous, and having failed to observe that law he cannot recover.

If I correctly understand the rule of the company referred to, it is but the statement of the common-law rule governing such conditions, and for that reason I will discuss only the legal question raised.

That rule of conduct is elementary, and it scarcely needs the citation of authorities to support it. [Montgomery v. Railroad, 109 Mo. App. 88; Moore v. Railroad, 146 Mo. 572; Brady v. Railroad, 206 Mo. l. c. 530.] The rule, however, like most other rules, has its limitations and exceptions, and one of them is that if the conditions are such that the safer way cannot be used, then the law will permit the selection of the more dangerous.

This question came before the Supreme Court of Iowa, in the case of Pierson v. Railroad, 127 Iowa 13. There the plaintiff, a brakeman, was attempting to uncouple two cars which were supplied with safety couplers, but the lever failed to work. He had the cars stopped and then placed in slow motion, and he then

went between the rails, walking with the cars, and attempted to pull the lever by hand. While doing so his foot caught in a defectively blocked guard-rail and was run over by the cars and injured. Plaintiff recovered judgment in the lower court, and defendant appealed. There was evidence to the effect that he might have gone around the engine or stopped the cars and crawled under, and thus been able to use the lever on the side. It was conceded that the use of the automatic couplers required the cars to be in motion to be uncoupled. The defendant cited Morris v. Railroad, 108 Fed. 747, and Gilbert v. Railroad, 128 Fed. 529; but the court refused to follow them, and held the whole question was for the jury. In speaking for the court Judge McClain used this language: "We think that, under the decisions of our own court, the question whether, when Harrington found that the safety appliance immediately available to him would not work, he acted as a reasonably prudent man, under the circumstances, in attempting to make the uncoupling by stepping between the rails after the engine was in motion, rather than incur the additional delay necessary to reach the other side of the train, and try to effect the uncoupling by the appliance on the freight car, was for the jury. . . . It was properly left to the jury in this case to say, not simply whether it would have been safer for Harrington to crawl under the coupling, or go around ahead of the engine to the other side of the train, and attempt to uncouple the car by means of the safety appliance, than to attempt to uncouple it by hand, as he did, but whether under all the circumstances, in view of the necessity for prompt action which is involved in the railway service, he was negligent in adopting the method which he did adopt, even though another might have been safer. [Bucklew v. Railroad, 64 Iowa 603; Gibson v. Railroad, 107 Iowa 596; Curtis v. Railroad, 95 Wis. 460; Ashman v. Railroad, 90 Mich. 567; Railroad v. Mooney, 40 Fla. 17.]"

The same doctrine is enunciated in the case of Kennedy v. Railroad, 190 Mo. 424, and Brinkmeier v. Railroad, 69 Kan. 738.

And the same question came before this court In Banc in the case of Brady v. Railroad, 206 Mo. l. c. 509, and on pages 533 and 534 Judge BURGESS quoted with approval what was said by Judge McCLAIN in the Iowa case.

It stands uncontradicted, that before the train reached Commerce both the respondent and the fireman on his engine attempted to locate the defective wheel by observation from the engine; and that when the train reached Commerce the former alighted from the engine and walked back to the tender and made as careful an inspection for the defect as the physical conditions as they then existed would permit. He not only looked carefully for the flat place upon the wheel, which was not larger than a silver dollar, but he also ran his hands around them in his endeavors to locate it, but failed to do so, for the reason, supposed by the witness, that the flat surface was either hidden by the brake-shoe or was resting upon the rail; either of which would, of course, have obscured it from view and protected it from touch. Having thus far failed to perform his duty to locate the defective wheel, he then resorted to the only other way, pointed out by the evidence, by which that duty could be performed, and that was by placing one foot on the step of the tender and the knee of the other leg upon the gangway of the tender while he grasped the handholds thereof with his hands. In that position he stood with his back toward the front of the train, looking toward the tender, watching the wheels thereof for the purpose of locating the defective wheel by seeing the journal box bounce up and down as the flat surface struck the rail.

Under this state of facts, if we apply the exception to the rule before mentioned, then we must hold that

the question, whether, when respondent found that he could not locate the defective wheel by looking at the wheels from his engine or by looking at and feeling them when on the ground, he acted as a reasonably prudent man, under the circumstances, should have done in attempting to make the discovery from the steps of the tender by watching the boxes of the journal bounce up and down as the wheels revolved, rather than incur additional delays, or entirely neglect his duty in locating the defect, was for the jury to say, under proper instructions from the court.

All the witnesses for both sides who testified as to the manner of locating defective wheels, with one exception, testified that respondent when injured was pursuing one of the usual and ordinary modes in general use among engineers throughout the country to discover such defects. Under that evidence, in almost the language of the Iowa court, it may be said that it was proper to leave it to the jury to say, not simply whether it would have been safer for respondent to have further delayed the train by telegraphing for and waiting instructions, than attempt to locate the defect by sight from the side of the tender, as he did, but whether, as before stated, under all the facts and circumstances, in view of the necessity for prompt action which is involved in railroad services, he was negligent in adopting the method which he did adopt, even though some other mode might have been safer.

We are, therefore, of the opinion that the trial court did not err in refusing the demurrer to the evidence, for the reason assigned by counsel for appellant.

VIII. It is finally insisted by appellant's counsel, that respondent is not entitled to a recovery, for the reason that having voluntarily elected to operate the engine over the track mentioned, and having known all

about it and its surroundings, he assumed the usual and ordinary risks incident thereto.

This contention embodies the principles of hornbook law, which, for the sake of brevity, are called "the assumption of risk." This rule is in full force in this State, as is shown by the many adjudications of this court. [Burnes v. Railroad, 129 Mo. 41, and cases therein cited.] However, that rule will not prevent a recovery in this case without it is first shown that the injury received by respondent was incidental to some risk assumed by respondent. The rule itself so states, and that statement suggests the question, were his injuries the result of any such risks? In answering that question it should be borne in mind that the servant never assumes risks occasioned by the carelessness or negligence of the master. [Henry v. Railroad, 109 Mo. 488, l. c. 494; Brady v. Railroad, supra; Zeis v. St. Louis Brewing Assn., 205 Mo. 638; Curtis v. McNair, 173 Mo. 270, l. c. 283; Holloran v. Foundry Co., 133 Mo. 470.] That rule is founded upon the well-known doctrine which requires the master to furnish the servant a reasonably safe place in which to work. [Burnes v. Railroad, supra, l. c. 51; Curtis v. McNair, supra; Holloran v. Foundry Co., supra.] And all the authorities, text-writers and courts unite in holding that if the master negligently fails to furnish his servant such a place, and the latter is injured in consequence thereof, then it cannot be successfully maintained that such injury was the result of a risk assumed by him; but, upon the contrary, such injury must be attributed to the dereliction of duty on the part of the master, and he is liable in damages therefor.

In the case at bar one of the main questions involved and submitted to the jury was, did appellant negligently maintain its railroad tracks so near the pottery building as to render the place unsafe and dangerous to the employees while operating trains over

the same? We have heretofore shown that the record abounds in evidence which tends to show that it was a dangerous place, and that appellant had knowledge of that fact; and upon that evidence the jury found for the respondent. That finding is conclusive against the contention of appellant to the effect that the respondent was injured as a result of a risk assumed by him.

In this connection counsel for appellant insists that the mere -fact that the servant with knowledge of the dangerous and unsafe place in which the master required him to work remains in his service, constitutes a waiver of all such defects and an assumption of all injuries incident thereto whatever the cause of the dangers; and cites in support thereof Charlton v. Railroad, 200 Mo. 413, l. c. 434; Blundell v. Mfg. Co., 189 Mo. 552, l. c. 559; Brady v. Railroad, 206 Mo. 509, l. c. 527; Mathis v. Kansas City Stock Yards, 185 Mo. 434, l. c. 444-5; Roberts v. Mo. & Kan. Tel. Co., 166 Mo. 370, l. c. 378-9; Nugent v. Milling Co., 131 Mo. 241; Junior v. Mo. Elec. Light Co., 127 Mo. 79, l. c. 83.

That is a misconception of the law. That rule has no application where the unsafe and dangerous place or conditions are rendered such by the negligence of the master. This is even shown by some of the cases above cited and relied upon by counsel for appellant.

In the case of Brady v. Railroad, supra, on page 528, Judge Burgess very clearly and tersely stated the rule as follows: "Therefore, if plaintiff, in uncoupling the cars, accidentally, and without negligence, fell and was injured, his injury could only be attributed to one of the ordinary risks of his employment, which risk he accepted, and the defendant cannot be held to respond in damages on account of said injury. But, while the servant assumes all ordinary risks incident to his employment, he does not assume extraordinary risks or such as are occasioned by the carelessness or negligence of the master. [4 Thompson's Com. on the

Law of Neg. (2 Ed.), sec. 4614.] And the authorities all hold that if the negligence of the master or his representative was the proximate or effective cause of the injury, then the master will be held liable.''

And in the case of Charlton v. Railroad, supra, Judge LAMM, equally clear and forceful in stating the rule and giving the reasons therefor, said, page 433:

''Assumption of risks rests on contract—negligence rests in tort. [Dale v. Hill-O'Meara Construction Co., 108 Mo. App. l. c. 97.] The servant, when he enters his master's employ, impliedly agrees with him, for the compensation named, to assume the risk of usual dangers incident to the work. But the servant does not assume the risk of the master's negligence, for a very good reason, and that is, because it is a fundamental proposition that it is against public policy for a master to contract against his own negligence. So, too, in the assumption of risks by a servant it is well to consider a certain assumption by the master, and that is, that the master impliedly contracts with the servant that he will exercise ordinary care to protect such servant from injury by providing a reasonably safe place for him to work. When these two assumptions are considered as proceeding hand in hand, it will be perceived that the risks assumed by the servant are those risks alone which remain after the master has exercised ordinary care.

''In Curtis v. McNair, 173 Mo. 270, VALLIANT, J., speaking for this court, said:

'' 'A servant assumes the risk of danger incident to the work he engages to perform, and if he is injured as a result of that which was to be expected in the usual course of such work, the master is not liable. There are many kinds of business the operations of which are attended with danger which cannot be prevented by ordinary care and precaution. When one engages in such business and suffers from causes incident to its character, he has no legal remedy. In

such case he suffers, not because of negligence of his master, but because of a danger incident to the business. But the only risk the servant does assume is of that which is liable to happen on account of the nature of the business when the master has used reasonable care to avoid such a result.

" 'It is the duty of the master to exercise reasonable care, commensurate with the nature of the business, to protect his servant from the hazards incident to it. [Williams v. Railroad, 119 Mo. 316; Rodney v. Railroad, 127 Mo. 676; Herdler v. Buck's S. & R. Co., 136 Mo. 3.]

" 'This duty the law imposes on the master and will not allow him to cast it off. It is contrary to public policy to allow the master to relieve himself by contract from liability for his own negligence. What the law forbids to be done by express contract, it will not assist to be done by implying a contract.

" 'A risk which the law, on the ground of public policy, will not allow the servant to assume, it will not imply from his conduct that he has assumed. [Blanton v. Dold, 109 Mo. 64; Settle v. Railroad, 127 Mo. 336; Pauck v. St. L. Dressed Beef Co., 159 Mo. 467; Wendler v. People's H. F. Co., 165 Mo. 527.] The servant never assumes the risk of the master's negligence.

" 'In a suit, therefore, by a servant against his master in which the petition alleges that the plaintiff's injuries were due to defective appliances furnished by the master for the use of the servant, the dangerous condition of which was known or by the exercise of ordinary care would have been known to the master, a plea which sets up that that condition was also known or by the exercise of ordinary care on his part would have been known to the servant, does not constitute a defense to the action on the theory of an assumption of risk by the servant, because the servant cannot as-

sume to bear the consequences of the master's negligence.'"

There are many other cases of like import and tenor.

In the case of Blundell v. Mfg. Co., supra, it will be seen by reading the facts that the defendant was held not liable because the evidence failed to show the company was guilty of any negligence whatever. And the same was true in the case of Roberts v. Mo. & Kan. Tel. Co., supra.

In the case of Nugent v. Milling Co., supra, the plaintiff was employed to work about machinery, which was in its very nature dangerous, which fact was as well known to the servant as it was to the master. And for that reason the court held the master owed the servant no duty to notify him of a fact of which he already had notice, and, therefore, the former was guilty of no negligence, but the injury was due to contributory negligence.

The same is true of the case of Junior v. Electric Light Co., supra. In the latter case also the evidence showed the plaintiff was guilty of negligence which contributed to his injury by omitting to use rubber gloves furnished him by the company with which to handle electric wires.

But those cases have no bearing upon the case at bar, for the reason that the evidence tends strongly to show that the railroad track was negligently constructed too near the old pottery building mentioned in the evidence, which rendered the place dangerous to the railroad employees; and that appellant, with full knowledge of said condition and dangers incident thereto, maintained and operated said road for some two and a half years. Mr. Brooks, the civil engineer who had charge of the construction of the road, had served the various companies who owned it, in that capacity, from the time of its construction down to a period subsequent to the date of the injury. Not only he but

other officers of the road knew of the dangers incident to the proximity of the road to the building. Under those facts the jury very properly found that the appellant was guilty of negligence in so maintaining and operating the road at that point, and that in consequence thereof respondent was injured.

Learned counsel for appellant seem to have confounded the doctrine of assumption of risk with the law of contributory negligence. As was very truly said by Judge BURGESS, in the case of Brady v. Railroad, supra, "Assumption of risk and contributory negligence are so closely allied that it is often very difficult to draw the line of demarcation between them." While sometimes it may be difficult to draw the line, yet in all cases there is such a line of demarcation, and if carefully scrutinized and followed it will always enable us to differentiate the one from the other. Contributory negligence and assumption of risk are separate and distinct defenses, and it is elementary that the former must be pleaded in order to be availing, while the latter need not be.

Even in those cases where there is no assumption of risk on the part of the servant, yet he will not be allowed to recover for injuries received where his negligence caused or contributed to that of the master in producing his injury; but it is an erroneous assumption to say that because the servant knows of the master's negligence and of the dangers incident thereto, the former assumes the risks incident to said dangers, simply by remaining in the services of the latter. The true rule in this State, as seems to be supported by the great weight of authority, is as below stated, viz.: Where the instrumentalities with which or the place where the servant is required to perform services are so glaringly defective and dangerous that a man of ordinary prudence would not use or occupy them, the master cannot be held responsible for injuries resulting from their use or occupancy, even though those

defective conditions were caused by the negligence of the master. In such cases the servant's contributory negligence and not his assumption of risk would prevent his recovery. But if the servant incurs the risks of place or machinery, which though dangerous are not so much so as to threaten immediate injury, or where it is reasonable to suppose that they may be safely used or occupied with great skill and care, the mere knowledge of the defects on the servant's part will not defeat a recovery. Negligence on the part of the servant in such cases does not necessarily arise from his knowledge of the defect, but is a question of fact to be determined by the jury from such knowledge and all other facts and circumstances shown by the evidence. [Huhn v. Railroad, 92 Mo. 440; Dale v. Railroad, 63 Mo. 455; Mahaney v. Railroad, 108 Mo. 191; O'Mellia v. Railroad, 115 Mo. 205; Waldhier v. Railroad, 87 Mo. 37; Hamilton v. Rich Hill Mining Co., 108 Mo. 364; Soeder v. Railroad, 100 Mo. 673; Warner v. Railroad, 62 Mo. App. 184.]

In the case at bar the evidence did not show such a glaring defect that a man of ordinary prudence should not have remained in the service of the appellant. Before he would be denied a recovery he must not only know of the defective conditions but he must also have known of the dangers arising therefrom and incident thereto. [Waldhier v. Railroad, supra.]

While there is evidence tending to show respondent knew of the close proximity of the road to the building, yet there was an abundance of testimony which tended to show that he did not know the actual distance between them, and there was no evidence that he knew of the dangers incident thereto, except such inference as an ordinarily prudent person might draw from the conditions as they then existed; since, however, the evidence shows he had only a general or imperfect knowledge of those conditions, then it must nec-

essarily follow that he .has no adequate knowledge of the dangers incident thereto.

Under that state of the record we cannot declare as a matter of law the respondent was guilty of contributory negligence, but we are of the opinion that the evidence properly presented a case for the jury's determination.

We are, therefore, of the opinion that the circuit court did not err in refusing the demurrer to the evidence.

IX. The last objection presented for a reversal of the judgment is the action of the court in giving instructions Nos. two and three, asked by respondent. The following is the objection urged against those instructions.

"In order to charge plaintiff with negligence in taking his position, he must have known with mathematical certainty, or by the exercise of ordinary care so known, etc., when he took his position on the steps of the tender, that said building was near enough to the track to strike him while in that position."

These instructions are set out in the statement of the case.

In our opinion the instructions are not subject to the criticism suggested. They properly presented the law of the case to the jury. Contributory negligence is an affirmative defense, and to be availing ordinarily it must be charged in the answer and established by the evidence; and before the court or jury would be justified in holding the respondent guilty of contributory negligence in this case, they must have been satisfied from the evidence that "he either knew or by the exercise of ordinary care might have known . . . that said building was near enough to the track to strike him while in that position."

The case was properly and fairly tried, and the judgment should, in our opinion, be affirmed.

This cause was transferred to court In Banc on the dissent of GRAVES, J.  After reargument and due consideration, the foregoing divisional opinion was adopted as the opinion of the court In Banc.

All concur therein, except *Graves, J.*, who dissents.