JOHN A. WENTZ v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.

Division One, June 30, 1914.

1. **NEGLIGENCE: Passenger: Demurrer to Evidence.** A railroad company in carrying a passenger is required to exercise for his safety the highest degree of care known to and generally exercised by a very careful and prudent person in that class of business. Where plaintiff was a passenger on defendant's regular passenger train, and as it approached a station named Sterling an employee passed through and announced, "Sterling; twenty minutes for supper," and then proceeded to the front of the car, opened the car and the vestibule door, and raised the trap, and the passenger followed him and as soon as the trap was raised descended the car steps, and just as he was in the act of alighting the train started with a jerk and threw him down, injuring him, a demurrer to the evidence should not be sustained, even though it was a dark night, and the train had stopped at a railroad crossing, as it was by law required to do, two or three hundred yards from the station at Sterling, which was brilliantly illuminated. The acts of the employee amounted to an invitation for him to alight, and there being no evidence

that he knew of the crossing or the custom of the train to stop there, he could not be charged with contributory negligence as a matter of law.

2. **INTERSTATE COMMERCE: General Denial: Waived by Special Plea.** A defendant by pleading a general denial raises the issue of interstate commerce, and that issue is not waived, nor is counsel for plaintiff misled, by a special plea of the common law of the State in which the accident occurred, as a defense.

3. **COMMON LAW OF ANOTHER STATE: Pleading and Proof.** Pleading statutes of another State declaring the Common Law of England to be in force there, is not pleading that law, and amounts to nothing more than statements of conclusions, and such pleas constitute no defense to an action for negligence. The common law is not the same in any two States, and the court cannot know what it is unless it is pleaded and proved; and if the only plea is that the defendant's liability is to be determined by the common law of the foreign State, the court will assume that the common law of that State is the same as the common law of this.

4. ————: **Passenger: Riding on Free Pass.** If the only defense pleaded is the common law of the other State where the accident occurred, and that law itself as it affects a passenger riding on a free railroad pass is not pleaded, then the holding will be that the laws of that State, like the laws of this, absolutely prohibit a common carrier from contracting against liability for damages occasioned by its own negligence.

5. ————: ————: ————: **Interstate Commerce: Waiver of Negligence.** A free pass issued by a railroad company, to the father of one of its employees, who is not a member of his family, for free transportation from one State to another, is, under the Interstate Commerce Act of Congress, null and void, and does not authorize the father to claim transportation upon the company's trains or to ride upon them, nor can any agreement printed upon it and accepted by the father to release the company from damages negligently inflicted, be held, under the common law of this State, to be a defense to a suit for personal injuries negligently inflicted by the company while the father was riding upon such free ticket.

6. **FAMILY: Definition: Interstate Commerce Act: Free Transportation.** The word family, in its general and restricted meaning, is defined; but the word as used in the Interstate Commerce Act declaring that a railroad company may issue an "interstate free ticket" to "employees and their families," is held not to include the father of an employee, who had resided in Wyoming, and when injured was on his way to Missouri

to spend the winter, with the intention of returning to Wyoming in the spring, to work upon a son's farm there.

7. ————: **Interstate Commerce Act: Purpose of Free Pass to Families.** The purpose of the clause of the Interstate Commerce Act permitting common carriers to issue an "interstate free ticket" to "employees and their families," was two fold: *First,* and primarily, because by the very nature of their employment, they are subject to frequent and sudden change of residence, and to secure their continued service it is necessary that their families be transported to the new field of work; and, *second,* to cement a closer union and better feeling between them and their employer, and to increase their personal interest in the road's prosperity and general welfare.

8. **NEGLIGENCE: Measure of Damages: Injuries in Question.** Where the instruction told the jury that, in assessing plaintiff's damages, to take into consideration the pain of body and mind "occasioned by his injuries in question," it cannot be held that they were misled thereby into allowing him damages for injuries received by a kick from a mule and the passing of a wagon over his limbs sometime after "the injuries in question."

9. ————: **Instruction: Abstract Proposition.** An instruction may be correct as an abstract proposition, and yet be vicious. If it correctly states the law as to some of the facts, but omits the law relative to the acts which caused the injury, it should be refused, for, by such segregation, the jury will be misled.

Appeal from Jackson Circuit Court.—*Hon. E. R. Morrison,* Judge.

AFFIRMED.

*Warner, Dean, McLeod & Langworthy* for appellant; *Byron Clark* of counsel.

(1) There is no evidence that the defendant was guilty of any negligent act. The announcement of the station and the opening of the vestibule doors as the train approached the depot were not only proper but were required as a matter of convenience to the passengers. The stopping of the train at the crossing was required by law and there was no reason to anticipate that the plaintiff would attempt to alight at that place, especially where there was no station, no lights, no

platform, and the conductor himself had not yet alighted, and had not placed the stool to assist the passengers from the car. Union Pacific v. Luck, 79 Kan. 320; Mitchell v. Railroad, 51 Mich. 236; Railroad v. Holmes, 97 Ala. 332; Lunsford v. Railroad, 153 Ky. 283; Morris v. Railroad, 53 So. (La.) 698; Railroad v. Massey, 53 So. (Miss.) 385; Stewart v. Railroad, 146 Mass. 605. The plaintiff in rushing out of the car and down the steps without looking where he was going and stepping off the train in the dark at a place where there was no station, no platform, no lights, and when he could have easily discovered, if he had looked, that the train had not yet reached the station, was guilty of contributory negligence as a matter of law. Farrell v. Railroad, 100 Minn. 361; Hester v. Electric Co., 130 Ga. 454; Mitchell v. Railroad, 51 Mich. 236; Mearns v. Railroad, 163 N. Y. 108; Mearns v. Railroad, 139 Fed. 543; Bartle v. Railroad, 105 N. Y. Supp. 522; Railroad v. Holmes, 97 Ala. 332; Railroad v. Murray, 113 Ga. 1021; Nagel v. Railroad, 88 Cal. 86; Lunsford v. Railroad, 153 Ky. 283. (2) The court committed error in refusing to admit in evidence the free pass upon which the plaintiff was riding, and the conditions contained on the back thereof. The exclusion of the pass and the conditions thereof deprived the defendant of its constitutional rights. Since the pass upon which plaintiff was riding provided for interstate transportation, the conditions thereof must be construed in accordance with the decisions of the Federal courts. Interstate Commerce Act, being Act February 4, 1887, c. 104, sec. 1, as amended; U. S. Comp. Stat. 1901; Supp. 1911, pp. 1285, 1286; Express Co. v. Croninger, 226 U. S. 491; Railroad v. Harriman, 227 U. S. 672; Mondou v. Railroad, 223 U. S. 54; Railroad v. Vreeland, 227 U. S. 66; Minnesota Rate Case, 230 U. S. 398; Text Book Co. v. Pigg, 217 U. S. 108; Stove Co. v. Vickers, 226 U. S. 215; Railroad v. Elevator Co., 226 U. S. 426. Under the Federal authori-

ties and decisions the provisions and conditions of the pass offered in evidence were and are valid and binding, and the pass and the conditions upon which it was issued should have been admitted in evidence. Railroad v. Adams, 192 U. S. 440; Boering v. Railroad, 193 U. S. 442; Duncan v. Railroad, 113 Fed. 508; 2 White on Personal Injuries on Railroads, secs. 851, 852. Even if the decisions of the Federal court did not control, the question as to the validity of the conditions contained on the pass would have to be determined either by the laws of the State where the pass was delivered or where the accident occurred. Smith v. Railroad, 194 Fed. 79; Shelton v. Railway, 189 Fed. 153; Railroad v. Grom, 142 Ky. 51; Magill v. Railroad, 84 S. C. 416; Hasbrook v. Railroad, 118 N. Y. S. 735; Hughes v. Railroad, 202 Pa. 222; Barnett v. Railroad, 176 Pa. 45; Stamp v. Railroad, 161 S. W. (Tex. Civ. App.) 450; Knowlton v. Railway, 19 Ohio St. 260. The pass was delivered in Wyoming, and the accident occurred in Colorado. Under the statutes of both of those States, which were offered in evidence, the common law of England was and is in force and effect in said States. R. S. Wyoming, 1899, sec. 2695; G. S. Colorado, 1908, sec. 6295. There is no statute or decision in the State of Wyoming, or the State of Colorado, making the conditions contained on the pass invalid, and under the common law of England such provisions are valid and binding. McCauley v. Railroad, L. R. 8 Q. B. D. 57; Hall v. Railroad, L. R. 10 Q. B. D. 437; Railroad v. Adams, 192 U. S. 440; Holly v. Railroad, 119 Ga. 767; Railroad v. Read, 37 Ill. 484; Payne v. Railroad, 157 Ind. 616; Rogers v. Steamboat Co., 86 N. E. (Me.) 261; Quimby v. Railroad, 150 Mass. 365; Kinney v. Railroad, 32 N. J. 407; Welles v. Railroad, 26 Barb. (N. Y.) 641; Wells v. Railroad, 24 N. Y. 181; Perkins v. Railroad, 24 N. Y. 196; Muldoon v. Railroad, 10 Wash. 311; Marshall v. Railway & Light Co., 101 S. W. (Tenn.) 419; 2 Hutchinson on Carriers (3 Ed.),

sec. 1075; Griswold v. Railroad, 53 Conn. 371; Duncan v. Railroad, 113 Fed. 508; White on Personal Injuries on Railroads, secs. 851, 852, note 39, pp. 1258, 1259. The court in refusing to admit in evidence the pass and the conditions contained on the back thereof, deprived the defendant of its property without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States, and in violation of section 30 of article 2 of the Constitution of Missouri, and also abridged the privilege of the defendant as a citizen of the United States to contract, in violation of the Fourteenth Amendment to the Constitution of the United States, and impaired the obligation of the contract as contained in the provisions and conditions on the back of said pass in violation of section 10 of article 1 of the Constitution of the United States. Pritchard v. Norton, 106 U. S. 124; Hovey v. Elliott, 167 U. S. 409; Calhoun v. Fletcher, 63 Ala. 570; Zigler v. Railroad, 58 Ala. 594; Jensen v. Railroad, 6 Utah, 253; Dorrance v. Dorrance, 242 Mo. 651; Text Book Co. v. Pigg, 217 U. S. 91; Ex parte Young, 209 U. S. 123; Hoke v. Henderson, 15 N. C. 16.

*Boyle & Howell* and *Joseph S. Brooks* for respondents.

(1) The court did not err in overruling the demurrer to the evidence interposed at the close of plaintiff's case nor did it err in refusing to give to the jury the peremptory instruction requested by the defendant at the close of the entire case. 2 White's Personal Injuries on Railroads, sec. 704; McNulta v. Eusch, 134 Ill. 46; Railroad v. McCormick, 124 Pa. St. 427; Railroad v. Davis, 103 S. W. 603; McGee v. Railroad, 92 Mo. 218; Weber v. Railroad, 100 Mo. 194; Grace v. Railroad, 156 Mo. 295; Beach on Con. Neg., p. 173, and sec. 23, p. 71; Kearney v. Railroad & Nav. Co., 59 Ore. 12; Crandall v. Railway, 96 Minn. 434. (2) The court

did not err in refusing to admit in evidence the free pass upon which the plaintiff was riding and the conditions contained on the back thereof, nor did the exclusion thereof deprive the defendant of any of its constitutional rights. The general doctrine is that one who is accepted for transportation as a passenger without any compensation, is nevertheless entitled to all the care and protection which the carrier is under obligation to furnish paying passengers. 5 Am. & Eng. Ency. Law, p. 565; Lemon v. Chanslor, 68 Mo. 340; Dorsey v. Railroad, 83 Mo. App. 528; Buck v. Railroad, 46 Mo. App. 555; Railroad v. Derby, 14 How. 468; 6 Cyc. 544; Bryant v. Railroad, 53 Fed. 997; Frillingham v. Transit Co., 102 Mo. App. 559; Whittaker v. Railroad, L. R. 5 C. P. 464; Weller v. Railroad, L. R. 9 C. P. 126; Shohoney v. Railroad, 223 Mo. 684; Tel. Co. v. Pub. Co., 181 U. S. 92; 8 Cyc. 385; Interstate Com. v. Railroad, 145 U. S. 263; U. S. v. Worrell, 2 Dallas, 382; Smith v. Alabama, 124 U. S. 465; Livingston v. Moore, 7 Pet. 469; Davis v. Stouffer, 132 Mo. App. 555.

WOODSON, P. J.—This suit was instituted by the plaintiff in the circuit court of Jackson county against the defendant to recover the sum of $1950, damages, for personal injuries alleged to have been sustained by him through the alleged negligence of the company.

A trial was had before the court and a jury, which resulted in a verdict and judgment in favor of the plaintiff for the sum of $800. From this judgment the defendant duly appealed the cause to this court, because of certain constitutional questions involved.

The facts are practically undisputed and are substantially as follows:

The appellant was a railroad company duly organized and incorporated under the laws of Illinois, and had, among others, a line of tracks running through

the States of Wyoming, Colorado, Nebraska and Missouri.

The respondent was a resident of Wyoming and wished to go to Kansas City, Missouri. In order to so do he requested his son, an employee of appellant, to procure for him a free pass over said road to Kansas City, which the son did.

This pass entitled respondent to passage from Torrington, Wyoming, to Kansas City, Missouri. Upon the back of said pass there was printed the following provisions, which respondent signed:

"The person accepting this free ticket agrees as follows:

"1. To make only such use of it as permitted by the Interstate Commerce Law, or by the law of any State in which it may be used.

"2. That the company shall not be liable for any injury to person or baggage, caused by negligence, unless such negligence shall be gross, and in no event in a sum greater than $1000, in case of personal injury, and $100 in case of loss or damage to baggage."

The respondent, on November 8, 1909, entered one of appellant's passenger trains, at Torrington, with the intention to go to Kansas City, upon the supposed authority of the pass mentioned; one Gilchrist, slightly acquainted with respondent, accompanied him on said trip, both occupying the same seat—the respondent occupying the end of the seat next to the aisle of the car. Upon arriving at or near Sterling, Colorado, the conductor of the train, or some other employee of the company who had the authority to speak and act, came through the train and announced, "Sterling—twenty minutes for supper." The person who made the announcement proceeded through the car, opened the car door and the vestibule door, raised the trap, and the respondent and his companion, Gilchrist, immediately followed, and as soon as the doors were opened and the trap lifted the respondent descended the steps of the

car; and just as he was in the very act of alighting
the train started forward with a jerk and threw him
down, and caused the injuries complained of in this
case. Gilchrist did not alight.

There was some evidence which tended to show
that the person who made the announcement stepped
from the car before respondent fell therefrom, but I
do not think that is particularly material to the merits
of the case.

It was very dark at the time the respondent
stepped from the car and was injured, and there was
no station-house, platform or lights at that point—
simply a railroad crossing—which the law required the
appellant to recognize and to stop its trains before
passing over. Unquestionably this crossing and the
law mentioned were the cause of the train stopping
at the point where the respondent was injured, which
was two or three hundred yards north and west of
Sterling—the train, if I correctly understand the rec-
ord, was going southeast.

After reaching Sterling the train again stopped
and those of the passengers who wished supper alighted
and partook of such refreshments as they desired.

It seems that the conductor, in the meantime, had
some knowledge or notice that the respondent had got-
ten off at the road crossing, and that he had fallen
in so doing, and that in consequence thereof when the
respondent came up to the station, or while on the train
after it left Sterling, the conductor approached him
and asked if he was hurt, and repeated the question
and said, if you are hurt it becomes my duty to report
the case and the facts to the company. In answer
to this question the respondent answered that he was
not hurt, or if so, very slightly, and that the whole
thing was due to his own carelessness.

The latter statement was denied by respondent.
The respondent also testified that at the time he
alighted from the train he thought he was getting off

at the station, but that it was so dark he could see nothing.

The station, some quarter of a mile from the road-crossing, was well lighted and had a good platform upon which passengers could alight. Respondent could have seen the station and lights had he been looking for them at the place where he alighted. It was not only customary for the train to stop at the road crossing mentioned, but the law of Colorado required it to so do.

The appellant's evidence tended to show that the train at the crossing did not start with a jerk when respondent attempted to alight.

The respondent proceeded on his journey to Kansas City, without complaint; and the next spring he returned to Torrington, and began to work on a farm for one of his sons, and while so doing, a mule, according to its proverbial habit, kicked him in the back, knocked him down and a wagon ran over him, producing certain injuries.

At the trial the appellant offered in evidence the pass previously mentioned with the provisions printed on the back thereof, together with the signature thereto of the respondent, all of which the trial court excluded, and the appellant duly excepted.

Any other facts that may be necessary to be considered in passing upon any legal proposition involved in the case will be stated in that connection.

I. The first question that should be disposed of is, did the trial court err in refusing to give the appellant's instruction in the nature of a demurrer to the respondent's evidence? and second in declining to give its peremptory instruction at the close of all the evidence, telling the jury to find for the defendant?

**Demurrer to Evidence.**

In my opinion both of these questions must be decided against the appellant, and my reasons for so

stating are: That the record in this case shows that the respondent was a passenger upon one of appellant's regular passenger trains, which fact required of the latter the exercise of the highest degree of care that was known to and generally exercised by a very careful and prudent person, engaged in that class of business. [Lemon v. Chanslor, 68 Mo. 340.]

The evidence shows that the train upon which respondent was being carried, approached Sterling and that someone in authority announced "Sterling— twenty minutes for supper," and proceeded to open the car doors and lifted the trap leading to the ground, so that the passengers upon the train might alight; and after so saying and acting, the train came to a full stop. That in the meantime, when the announcement was being made and the doors opened, the respondent and his traveling companion immediately arose from their seats and followed the party making the announcement to the door, which he opened, leading from the car to the ground, with the intention of going to the dining room for supper.

These facts are not disputed, but counsel insist that the respondent was not entitled to a recovery for several reasons: first, because the announcement made, the opening of the door, the lifting of the trap and the stopping of the train did not amount to an invitation to the respondent to alight therefrom, but was only intended to notify him and the other passengers that they were approaching Sterling, so that they might make the necessary arrangements to alight for supper when the train actually reached the station.

There can be no doubt but what that was the real intention of the parties in charge of the train; but appellant overlooks the fact that the evidence fails to show that the respondent knew of that fact or that there was a crossing between the point where the train was at the time the announcement was made and the town of Sterling where he was expected to take supper, or that

he knew the train was stopped for said crossing. In the absence of that knowledge the most natural thing in the world for one who wished supper under the circumstances, would be to conclude that the train was stopping at that point for the purpose of allowing passengers to alight for supper. This was clearly indicated by the opening of the doors to the car and vestibule, the lifting of the trap over the steps leading to the ground and the announcement of "twenty minutes for supper." None of those acts or words were necessary if it was simply the design of the appellant to stop at a railroad crossing. It could mean nothing else. The announcement and the opening of the doors were equivalent to a plain invitation to all passengers upon the train to alight and take supper. Of course, to those, if any, who know of the crossing and the custom of the train to stop thereat, in obedience to the law, and that there would be another stop at Sterling for supper, quite a different question would be presented; but no such knowledge is brought home to the respondent in this case. Consequently the case, in so far as the respondent is concerned, stands as though no crossing at that point existed, and that no stoppage of the train at that place had been the custom. That being true, the jury was unquestionably warranted in finding that the acts of the appellant amounted to an invitation to the respondent to alight from the train at that point.

Counsel for appellant seem to concede that proposition to be sound yet insist that respondent was guilty of such contributory negligence in stepping from the train, in the dark, under the circumstances mentioned, that the court should have declared as a matter of law he was not entitled to a recovery in this case.

The basis for this contention is, that the dining-room at Sterling, some two to four hundred yards distant from the crossing, was brilliantly illuminated and could have been easily seen by respondent had he looked in that direction for it.

In my opinion the evidence in this case warrants that conclusion; but the trouble of the petition of counsel for appellant is that there is no evidence contained in this record which shows that he had any reason to look a quarter of a mile up the track for the dining room, when the company had distinctly announced to him that the train was then stopping at the dining room for supper. While it may be true that a person ·of ordinary common sense and experience might and should have known that an "eating house" on a railroad is located at a station and is fully lighted, yet it is also common knowledge that such dining rooms are not always located directly upon the line of the road, but in some instances, if not frequently, are upon a by-street, where they cannot be seen from the train. This fact, taken in connection with the invitation to then and there alight, in my opinion, clearly made a case for the jury; and makes it equally clear that the trial court did not err in declining to instruct the jury that the respondent was guilty of contributory negligence, and therefore was not entitled to a recovery.

These views are fully sustained by the following authorities:    2 White's Personal Injuries on Railroads, sec. 704; Kearney v. Ry. & Nav. Co., 59 Ore. 12; Crandall v. Railroad, 96 Minn. 434; Kansas City Southern Ry. Co. v. Davis, 83 Ark. 217; McGee v. Railroad, 92 Mo. 208, l. c. 218; Fillingham v. Transit Co., 102 Mo. App. l. c. 589; Railroad v. Painter, 53 Kan. 414; McDermott v. Railroad, 82 Wis. 246; Railroad v. White, 88 Pa. St. 327; Robson v. Railroad, L. R. 2 Q. B. D. 85; Poole v. Railroad, 100 Mich. 379; Bass v. Railroad, 70 N. H. 170; 5 Am. & Eng. Ency. Law, p. 565.    And many others too numerous to mention.

II.    The second ground relied upon by counsel for appellant for a reversal of the judgment is stated in the following language:

''The court committed error in refusing to admit in evidence the free pass upon which the plaintiff was riding, and the conditions contained on the back thereof. The exclusion of the pass and conditions thereof deprived the defendant of its constitutional rights.''

It is the contention of counsel for appellant that since the pass offered in evidence entitled the respondent to transportation through two or more States and that having availed himself of its benefits, the question of interstate commerce is thereby injected into the case.

This contention of counsel is controverted by respondent for several reasons assigned.

First: It is insisted that since the defendant pleaded specially as a defense the common law of Wyoming and Colorado, as adopted by section 2695, Revised Statutes 1899, of the former State and section 6295, Revised Statutes 1908, of the latter, that it should be confined to that defense and not be permitted to interject into the case the interstate commerce question previously mentioned, for the reason assigned that, by having interposed the special defense, the respondent was thereby led to believe that no other defense would be made, and consequently he made no preparation to meet the Federal question mentioned.

The case of Beave v. St. Louis Transit Co., 212 Mo. 331, is an express authority in support of this insistence; but counsel for respondent overlook the fact that in addition to the special defense stated, the answer in this case also contained a general denial, which entitled appellant to interpose any Federal question, for the reason that while the State courts will not take judicial notice of the laws of a sister State, yet they will so notice the Constitution and laws of the United States. Counsel for respondent concede that it was unnecessary for appellant to plead the

interstate commerce act. But it was necessary to plead the statutes of the States mentioned, if it wished to rely upon that defense also.

The appellant strictly observed the rules of good pleading and did nothing improper to mislead counsel for respondent or to lull them into a belief that the appellant would only rely upon the statutes pleaded as to any defense it had in the case.

The case of Shohoney v. Railroad, 223 Mo. 649, does not cover this question.

We are, therefore, of the opinion that there is no merit in this insistence.

Second: It has been suggested that this is not a suit on the pass for a breach of contract, but for a tort—the wrongful injury of respondent, the contract thereby having been waived, and therefore the interstate commerce question was thereby forever barred as a defense to the case; and that being true, the common law of Colorado, where the injury occurred, governs the case.

The Wyoming and Colorado statutes were pleaded in the following language:

"Defendant further says that at all the times and dates mentioned or referred to in the petition and in this answer there was a statute in full force and effect in said State of Wyoming, being section 2695 of Revised Statutes of Wyoming, 1899, providing that the Common Law of England as modified by judicial decisions, so far as the same is of a general nature and not inapplicable, shall be the rule of decision in that State, and considered in full force until repealed by legislative authority; and there was also a statute in full force in the State of Colorado, being Section 6295 of Revised Statutes of Colorado, 1908, providing that the Common Law of England, so far as the same is applicable and of a general nature, shall be the rule of decision and shall be considered as of full force until repealed by legislative authority."

The statute of Colorado was introduced in evidence and reads as follows:

"The Common Law of England, so far as the same is applicable and of a general nature, and all acts and statutes of the British Parliament, made in aid of or to supply the defects of the common law prior to the fourth year of James the First (excepting the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth and the ninth chapter of thirty-seventh Henry the Eighth), and which are of a general nature, and not local to that kingdom, shall be the rule of decision, and shall be considered as of full force until repealed by legislative authority."

Under the ruling of this court, as announced in the case of Gibson v. Chicago Great Western Railway Co., 225 Mo. 473, these pleas of the Wyoming and Colorado statutes were mere statements of conclusions and stated no defense to the cause of action whatever.

It was there held that when the statute of another State is relied upon as giving or constituting a cause of action it must be substantially pleaded with such distinctness that the court may judge of its effect and the facts that constitute its violation must also be pleaded. That a foreign statute in such cases must be pleaded just as any other substantive fact in the case, and not merely state conclusions of what counsel think they mean.

Of course the same rule applies when a foreign statute is interposed or pleaded as a defense to an action.

But conceding for the present that the statute of Colorado (the Wyoming statute cutting no figure whatever in the case) was properly pleaded, yet it is so indefinite in its terms that it affords the court of this State no information whatever as to what the common

law of that State actually was at the time the respondent was injured. Recognizing this fact counsel for appellant introduced in evidence many opinions delivered by the Supreme Court of the United States and many of the various States of the Union, as well as a number by the courts of last resort in England, but not one from any court in the States of Colorado or Wyoming; and if I have made no mistake in my comparison of the list of the cases, none of those introduced in evidence originated under the laws of either of those two States. This, however, had they done so, would have had but little force and effect as a matter of evidence, for the plain reason that the courts of one State cannot declare the law of another except in the particular case in judgment; for the reason the other State is not legally bound to recognize the rule of law announced in that case outside of enforcing the particular judgment under the full faith and credit clause of the Constitution of the United States.

Upon that state of the record, this nor any other court of this State can say what the common law of Colorado was at the time of the injury. This is true for the reason that the common law of England has never been adopted in full by any State of the Union, and but few, if any of them, have adopted it to the same extent.

In discussing this question this court in the case of Foley v. Harrison, 233 Mo. 460, l. c. 520, quoting largely from the Supreme Court of the United States, used this language:

"Before passing to the consideration of the authorities of this country specially applicable to the case at bar it will not be out of place to suggest that the common law of England bearing upon this question was never in force in all of its provisions in any of the States of this country. In the consideration of this subject Mr. Justice McLEAN, in Wheaton v. Peters, 33 U. S. 659, said: 'No one will contend that the com-

mon law as it existed in England has ever been in force in all its provisions in any State of this Union. It was adopted so far only as its principles were suited to the conditions of the Colonies; and from this circumstance we see that what is common law in one State is not so considered in another. The judicial decisions, the usages and customs of the respective States must determine how far the common law has been introduced and sanctioned in each.'

"In Commonwealth v. York, 9 Met. 93, Chief Justice SHAW said: 'As this is an unwritten law, we must seek for the evidence of it in judicial records, precedents and decisions, and those digests, treatises and commentaries of learned and experienced men, which have acquired respect and confidence by long usage and general consent. If we consult English decisions made since the Revolution, it is not because they have any binding force as rules, but because they are expositions of the rules and principles of the common law, by men of great experience and judgment in the knowledge and application of the same laws which we are seeking to expound. And if we read the digests and treatises of reputable authors, published since we ceased to be English subjects, it is because they contain the authentic records of the precedents and judicial proceedings, which furnish the evidence of the common law. In like manner, the decisions of courts of other States, having the same common origin, and deriving their laws from the same common source, are valuable and useful in enabling us the more clearly to understand, and the more fitly to apply, the rules and principles of our own authoritative code of laws.' "

Under these rulings this court has no alternative except to return to the old and familiar rule, that the courts of this State will presume that the common law of a sister State (if it exists therein by statute or otherwise) if not definitely stated, is the same as it is in this State.

If we should adopt that rule then we would be forced to hold that the common law of Colorado, like the laws of this State, absolutely prohibits a common carrier from contracting against liability for damages occasioned by its own negligence.

Judge LAMM forcefully stated this proposition of law in the case of Charlton v. Railroad, 200 Mo. 413, l. c. 433, and it has been uniformly approved ever since. [George v. Railroad, 225 Mo. 364, l. c. 408.]

If the conclusions reached in this paragraph of the opinion were all that are necessary to dispose of the question of the admissibility of the pass issued by the appellant to respondent, then there would be no question but what the trial court correctly excluded the pass and the endorsement thereon from the jury. But judging from briefs of counsel for appellant, they are not inclined to such a passive submission to this disposition of this, the interstate commerce question, by having it brushed aside by such a gentle breeze of waiver by a suit in tort. They seem to have an idea, even though the contract was waived by suing in tort, that the respondent's presence upon the train and his transportation was being conducted under its provision at the time he was injured; and that the waiver of the contract for the purpose of this suit did not destroy the fact that he was traveling on the pass, and that fact of itself injected into the case the Federal question mentioned, and should therefore be governed by the law as announced by the Supreme Court of the United States.

Viewing this case as I do, I am of the opinion that it is not necessary to decide this question one way or the other, for the reason that another fact appearing from the face of this record regarding the pass renders it absolutely null and void under the very law relied upon by counsel for appellant to defeat a recovery, which I will now proceed to consider.

The record shows that the pass upon which respondent was riding at the time he was injured was good for transportation from Wyoming, through the States of Colorado and Nebraska, to Kansas City, Missouri; and that his son was an experienced railroad man, an employee of the appellant, and procured the free pass for his father, the respondent, by virtue of his employment. The pass was issued and the respondent was injured on or about the 8th day of November, 1909. On February 4, 1887, an act of Congress, as amended, relating to the regulation of interstate and foreign commerce became effective. [U. S. Compiled Statutes 1901, Suppl. 1911, pp. 1284, 1285, 1286 et seq.]

*Interstate Commerce Act.*

In the third paragraph of section 1 of the foregoing act is the following provision:

"All charges made for any service rendered or to be rendered in the transportation of passengers or property and for the transmission of messages by telegraph, telephone, or cable, as aforesaid, or in connection therewith, shall be just and reasonable; and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful."

In the fourth paragraph of the same section is the following:

"And it is hereby made the duty of all common carriers subject to the provisions of this act to establish, observe, and enforce just and reasonable classifications of property for transportation, with reference to which rates, tariffs, regulations, or practices are or may be made or prescribed, and just and reasonable regulations and practices affecting classifications, rates, or tariffs, the issuance, form and substance of tickets, receipts and bills of lading, . . . and every such unjust and unreasonable classification, regulation, and practice with reference to commerce between the

States and with foreign countries is prohibited and declared to be unlawful.''

Paragraph 5 of the same section provides as follows:

''No common carrier subject to the provisions of this act shall, after January first, nineteen hundred and seven, directly or indirectly, issue or give any interstate free ticket, free pass, or free transportation for passengers, except to its employees and their families, its officers, agents, surgeons, physicians and attorneys at law.''

This record also shows that the respondent when injured was on his way to spend the winter in Kansas City, with the intention of returning to Wyoming in the spring, with a view of working upon the farm of his son—whether the son who procured the pass or not, the record does not show, and I suppose that fact is immaterial.

Under the Act of Congress mentioned, the appellant was absolutely prohibited from issuing a free pass to anyone *"except its employees and their families,"* etc.

There is no evidence preserved by this record which tends to show that respondent was an employee of the appellant or that he was a member of the son's family within the meaning of the act of Congress under consideration. A grown man's father is not necessarily a member of the son's family and *vice versa.* In fact, common observation teaches us that he rarely is a member thereof. Frequently we find that to be true, but the rule is to the contrary as everyone is informed by common knowledge. This common observation also teaches us that the grown son is more often a member of the father's family than the father is a member of the son's family.

The son mentioned in this case is the employee referred to in the fifth paragraph of the section of the act of Congress previously quoted, and of course the

family therein mentioned was his family and not the members of his father's or those of other persons.

Now the word family in the abstract has a very broad and varied meaning. It also has a very narrow and limited meaning according to the context in which the word is used. The best definition of the word I have been able to find is given by 19 Cyc. 450 to 454, and is as follows:

"FAMILY. While the term may be said to have a well defined, broad and comprehensive meaning in general, it is one of great flexibility and is capable of many different meanings according to the connection in which it is used; thus it may mean 'children,' 'wife and children,' 'blood relations,' or the 'members of the domestic circle,' according to the connection; it may be of narrow or broad meaning as the intention of. the parties using the word, or as the intention of the law using it, may be made to appear; but unless the context manifests a different intention, the word 'family' is usually construed in its primary sense. In its ordinary and primary sense the term signifies the collective body of persons living in one house, or under one head or manager, or one domestic government; the relations between such persons necessarily being of a permanent or domestic character, not that of persons abiding temporarily together as strangers; a household; those who live under the same roof with the *pater familias,* who form his fireside; in its restricted use in this sense the term would include only parents and their children, but the term, as commonly understood, is not so limited; thus it may include grandchildren, and all the persons of the same blood living together in the household; so it may include sons-in-law and daughters-in-law; in fact, it may include all members of the household living under the authority of the head thereof, as the servants employed in the house; and sometimes it may include persons who are merely lodgers or boarders. No definite number of persons is necessary

to constitute a family when the term is used in its primary sense, except that there must be at least two persons, for it is obvious that a collection of persons must consist of more than one person; a husband and wife living together without children, servants or any one at all may constitute a family. The word is frequently used in common speech without reference to any established household, but merely for the purpose of indicating the individuals related, as husband, wife, or parents and children. In another sense in which the term is used it includes such persons as are descendants of a common ancestor, it being said that its strict meaning as thus used in this connection is 'children,' and that this is the meaning that should be given it unless the context shows the term to have been used in a different sense; nevertheless the term has been extended to include the issue of the ancestor's children, all his descendants, the whole group of persons thus related by blood, and is even said to be as broad as the word 'relatives,' which includes relatives by affinity as well as by blood; the husbands and wives of blood relatives. The ordinary meaning of the term when used in wills is said to be next of kin, but it may mean heir-at-law, and it may have many other meanings or shades of meanings; in fact its legal import must be determined by the intention of the testator expressed in the language of the whole instrument, read in the light of relevant circumstances existing at the time of execution, and different meanings may be given to the term in two distinct clauses in the same will, when used in one case in reference to real property and in the other to personal property; and sometimes it may be rejected for uncertainty. When the term is used in connection with real estate, it implies inheritance—that species of succession which belongs to inheritance.''

This definition is supported by all the authorities, as appears in a footnote thereto.

This court in the case of Ridenour-Baker Grocery Co. v. Monroe, 142 Mo. 165, has defined the words, a "head of a family" and the word "family" in their primary sense, the sense in which they are used in this class of legislation, in about as terse and clear language as I have been able to find. Judge GANTT, on page 170, said:

"Long before the adoption of our homestead act this court had defined the words 'head of a family' to be one who controls, supervises and manages the affairs about the house, not necessarily a father or a husband. [State v. Slater, 22 Mo. 464; Spengler v. Kaufman, 46 Mo. App. 644; Wade v. Jones, 20 Mo. 75; State to use v. Kane, 42 Mo. App. 253.]

" 'A family is a collective body of persons who live in one house under one head or manager.' [Duncan v. Frank, 8 Mo. App. 286.]' "

Evidently this is the sense in which Congress used the word family. The design of Congress was to permit a common carrier to carry its employees and their families free, primarily because it is common knowledge that they are, and the very nature of their employment makes them, subject to removal or change of residence from place to place, as the necessity of the business may require; and in order to accomplish that purpose promptly it is often necessary to not only transport the employee free, but to send his family with him also—otherwise, they would not be able to go, or submit to the change, and consequently his separation from his family often would prove detrimental to the public service in which the carrier is engaged. To meet this well known situation Congress authorized the carrier to pass its employees and their families free. The secondary inducement for the passage of the act, I apprehend, was to cement a closer union and better feeling between the carrier and its employees by transporting them and their families free upon the roads and trains which they maintain and operate,

thereby giving them that kind of a personal interest in the company that is enjoyed by the employees of almost all other persons and companies that employ labor. For the good of the service they know and feel that they bear a closer relation to their employer and are entitled to greater privileges and more favors than are the mere strangers having no connection with the road. This is not only just and reasonable, but it adds largely, I have no doubt, to the efficiency and safety of the public service. But independent of that, in the absence of any showing to the contrary, neither this consideration nor the plain words of the act brings the father into the circle of the son's family, within the meaning thereof.

In so far as this record discloses, they did not live in the same household, neither was dependent upon the other nor owed each other any duty whatever outside of the ties of consanguinity—the filial duties of the son to the father and the paternal affection of the father for the son. But this relationship does not bring the father in this case within the meaning of the act of Congress.

In the absence of other considerations there is no more reason for saying that a father should be considered a member of his son's family than his grandfather or grandson should be, who live with their respective families.

Congress did not intend by this act to authorize a common carrier to issue free transportation to its employees *and all of their blood relations in direct or collateral lines,* except where they were bona-fide members of the employee's family.

If that was the design of Congress, then the act had just as well not have been enacted, for I dare say that if the million or more employees of the common carriers in this country and all their blood relations, regardless of family ties, are embraced within the provisions of this act of Congress, then by far the larger

part of the citizens of the United States may, by consent of the carriers, lawfully travel free—thereby creating an evil far greater in extent than the one the act was designed to correct.

This, while a conjecture, I suppose no one at all familiar with the situation would deny.

If we have placed the proper construction upon the act of Congress under consideration, of which I have no doubt, then the pass offered in evidence, with the endorsements thereon, was absolutely null and void, and did not authorize the respondent to ride on it, nor can it be made the basis of an agreement to waive or release any or all damages he received by or through the negligence of the appellant while riding upon its train from Wyoming to Missouri. That being true, then the question naturally arises, what law governs this case?

Anticipating this question in a previous portion of the opinion, we reverted to the facts of the case and set out the statutes of Colorado offered in evidence, and referred to the decisions of the courts of this country and England introduced in evidence by appellant.

In taking up those matters it will not be necessary to restate the facts, but it should be borne in mind that the injury occurred in Colorado, and that the statute of that State, adopting the common law of England with certain limitations, was introduced and read in evidence, but no decision of any of the courts of that State declaring what that statute means was offered.

That being true, and that statute being so vague and uncertain, in the absence of a decision of the Colorado courts telling us what it means regarding the common law applicable to the questions in hand, must assume that the common law of that State in that regard is the same as the common law of this State, which is to the effect that a contract made and entered into by and between a passenger and a common carrier releasing any or all

damages for injuries received by him through ordinary or gross carelessness, if I may so use the words, is absolutely null and void, and that the courts of this State will not admit them in evidence or give to them any force or effect as against the injured passenger. This is so firmly established by the George-Railway case, previously mentioned, and cases cited therein, that it would be useless waste of time to cite others in support thereof.

This being true, and the free pass, upon which respondent was riding at the time he was injured being void as previously held by applying the common law of Colorado to the facts, which we must assume was the same as that of this State, we must hold that the circuit court of Jackson county, Missouri, in the trial of this cause did not err in excluding the pass and the endorsements thereon from the consideration of the jury.

III.   It is contended by counsel for appellant that the trial court erred in giving instruction numbered one for the respondent.   This is the ordinary instruction repeatedly approved by this court, **Instruction.**   telling the jury the degree of care the carrier owes a passenger; the facts that constituted negligence if the jury believe them to be true; and the measure of damages.

If I correctly understand counsel for appellant, they do not complain of this instruction because of any error in the matters suggested, but complain of it because it ignored and refused to give force and effect to the free pass and the endorsements thereon, upon which respondent was riding at the time he was injured.

We have fully answered that contention in the previous paragraph of this opinion, and I feel as though I can throw no more light upon it by further consideration.

There is no merit in this contention.

IV.   Complaint is also lodged against the action
of the trial court in giving the following
**Limited to**
**Injuries in**      instruction at the request of the respond-
**Question.**        ent:
"The court instructs the jury that, if
under the evidence and instructions of the court you
find in favor of plaintiff, you should assess his damages
at such an amount as you believe, from the evidence,
will be a fair compensation to him for the injuries, if
any, received by him, and, in arriving at the amount
of your verdict, you may take into consideration the
pain of body and mind, if any, which he has suffered,
occasioned by his injuries in question, if any, not to ex-
ceed, however, in all the sum of nineteen hundred and
fifty dollars."

It is contended by counsel for appellant that this
instruction is so broad and indefinite that it misled
the jury, and may have authorized it to include in the
verdict the injuries the respondent received by the kick
of the mule and the passage of the wagon over his
limbs, which occurred some months after the respond-
ent returned to Wyoming and while working on the
farm of his son.

By reading this instruction it will be seen that in
express terms it limits the damages to the injuries,
if any, "which he [the respondent] suffered, occasioned
by his injuries in question," etc.

There were no injuries "in question" except those
sued for.

While it was true appellant introduced evidence
tending to show respondent was injured by the mule
and wagon, yet they were not "in question" within the
clear meaning of the instruction.   No court or jury
would believe for a minute that the respondent was
suing the railroad company for injuries received by
him from the kick of a mule or the passage of a wagon

over his legs, which occurred, if at all, months after the injuries sustained in the railroad accident.

There is no merit in this complaint.

V.    It is finally insisted that the circuit court erred in not giving the following instruction requested by appellant:

"The court instructs the jury that those in charge of the train on which plaintiff was riding had the lawful right to stop the train at the time and place they did stop it before passing over the railroad crossing referred to in the testimony; they also had the lawful right to announce to the passengers the fact that the train was approaching the railroad station and that supper would be taken there, and to make such announcement a reasonable length of time before the train arrived at the station to enable the passengers desiring to get off to make preparations therefor; they also had the lawful right, upon making such announcement, to commence opening the doorways leading from the cars composing said train a reasonable length of time before arriving at said station so that they might all be open by the time the train stopped at said station."

Stopping Train for Supper.

There can be no question but what this instruction, as an abstract proposition, correctly states the law, but the vice of it consists in the fact that it stops short of the facts of the case which occurred in connection with those enumerated, that caused the injury. This segregation of the acts, which the appellant had the lawful right to do, from those it had no right to do, would have, if given, tended strongly to mislead the jury, in concluding that the appellant had the lawful right to do all the things enumerated in the instruction and that the respondent had no right to complain of them, notwithstanding they constituted the invitation which induced him to be in the place of danger he was placed in thereby, when the train unexpectedly and without no-

tice, lurched forward, or rather started forward with a jerk.

This instruction as asked was properly refused.

Finding no error in the case the judgment of the circuit court is affirmed. All concur.