## THOMAS J. WHELAN, Respondent, v. UNITED ZINC and CHEMICAL COMPANY, a Corporation, Appellant.

### Kansas City Court of Appeals, April 5, 1915.

1. **NEGLIGENCE: Damages: Proximate Cause.** Plaintiff, an employee in a nitric acid plant, was engaged in drawing the residue from a retort into an open tank into which it flowed with considerable fall. A piece of hardened residue, negligently allowed to remain in the retort by the defendant, fell into the tank causing the caustic liquid to splash into plaintiff's eye. *Held*, that the negligent leaving of the hardened lump of residue in the retort, and not the splash, was the proximate cause of the injury.

2. ————: ————: **Contributory Negligence: Jury Question.** Where, in such case, it was the duty of plaintiff to get the residue out, and there was but one way to do it and only one place in which to stand in order to do so, it was a question for the jury as to whether plaintiff was guilty of contributory negligence in getting his face so close to the tank as to receive the injury. Defendant did not conclusively show that plaintiff was possessed of two ways of doing a thing, one safe and the other dangerous, and that, knowing the situation, he voluntarily chose the latter, and did something no reasonably prudent man would have done under the same circumstances.

3. ————: ————: ————: **Assumption of Risk: Jury Question.** Plaintiff could not be charged with assumption of the risk caused by the fall of the old residue into the tank since that was brought about through defendant's negligence. Nor could he, as matter of law, be said to have assumed the risk on account of the failure of defendant to provide a cover for the buggy. One of the great limitations on the doctrine of the assumption of risk is the principle that the employer must exercise reasonable care in the selection of his instrumentalities and of the methods used. And where there was evidence tending to show that reasonable care was not exercised by the employer in that no cover was provided for the tank, the plaintiff cannot be chargeable with assumption of risk as matter of law, but that question must be left to the jury.

4. ————: ————: ————: ————. A servant does not assume risks caused by his master's negligence. He only assumes the risks which are liable to happen on account of the nature of the

employment where the master has used reasonable care to avoid that result.

5. ————: ————: ————: ————: **Evidence of Other Methods and Appliances.** Where the evidence shows that the business is exceedingly dangerous, evidence of what appliances are in use in other plants is not admissible merely to show that the employer might have adopted a safer method; but evidence that appliances were in general and ordinary use in other plants, whereby danger from splashing was obviated, was admissible as bearing on the question whether the employer had used reasonable care in the selection of the appliances, since, if the employer had not exercised ordinary care in their selection, the doctrine of assumption of risk cannot apply.

6. ————: ————: **Kansas Cause of Action: Contributory Negligence and Assumption of Risk.** There is no substantial difference between the doctrines laid down by the courts of Kansas and those of Missouri on the subjects of contributory negligence and assumption of risk.

7. **TRIAL PRACTICE: Improper Argument.** When a statement that defendant was guilty of criminal neglect made in argument was objected to and the objection was sustained and the jury admonished not to consider it, and the remark objected to was withdrawn, no prejudicial error can be based upon it, even if the remark be otherwise considered improper. And a statement to the jury telling them they have no right to speculate on their verdict, that their duty went no further than its rendition, was not improper. It was not an appeal to return a verdict for reasons they could not entertain nor did it tend to rouse their prejudices.

8. ————: **Loss of Eye: Excessive Verdict.** Where plaintiff's eye was injured by a corrosive liquid producing a burning, ulcerating effect exceedingly painful and hard to cure, causing the eye to look like a piece of raw meat, and causing the injured eye to shrink in size and the tissues thereof to break down, and the sight of the other eye to be sympathetically affected, a verdict of $7500 will not be disturbed on the ground that it is excessive.

Appeal from Jackson Circuit Court.—*Hon. Kimbrough Stone*, Judge.

AFFIRMED.

*Sherman & Landon, W. V. Thompson* and *J. S. Cannon* for appellant.

188MA38

*T. J. Madden, E. C. Whitsett* and *Bird & Pope* for respondent.

TRIMBLE, J.—Plaintiff was employed in defendant's plant for the manufacture of nitric acid and other highly corrosive liquids. While drawing off the contents of a retort used in such manufacture, he received a severe and intensely painful injury to his sight caused by the heated and caustic liquid splashing into his eye. Alleging that it was the result of defendant's negligence, he brought this suit to recover damages.

There were eight retorts, located at uniform distances, in a room sixty feet long, and all built into and behind a brick wall sixteen feet high, parallel to, and about eleven feet north of, the south wall of the building. Each retort was about ten feet deep and eight feet in diameter and had a separate fire box thereunder. The fire boxes opened south in the retort wall, and through these doors each operator of a retort, standing in front thereof, fed the flames with fuel, consisting of coal piled behind him against the south wall of the building. A spout or tube, having an inside diameter of four inches, extended south from each retort through the retort wall to a distance of twelve inches therefrom and over this tube was fastened another having an inside diameter of six or eight inches and extending some six inches beyond the end of the inner tube. Thus the south end of this spout or tube was eighteen inches south of the retort wall and had a diameter of six or eight inches while six inches back from the end was a "shoulder" on the inside reducing the diameter to four inches. Into this larger tube and against this shoulder a mud plug was inserted and held in place by a clasp and collar over the outer pipe while the contents of the retort were being cooked.

A brick or concrete floor covered the retorts and over the center of each was an opening in the floor eighteen inches in diameter until the top of the retort

was reached where there was an opening in the center
of it eight inches in diameter. This formed a sort of
hopper into which was dumped the retort's charge,
consisting of nitrate of soda and sulphuric acid. Af-
ter the charge was placed in the retort, this opening
in the top was closed, as was also the spout below with
the mud plug as herein above indicated. The charge
was then cooked for eleven and one-half hours or until
the thermometer, and possibly some other gauges on
the retort, indicated that the process was finished.
During this process the nitric acid passed off in vapor
through pipes to its proper receptacle. The residue in
the retort, termed "soup," had to be drawn therefrom
through the spout. It was accomplished in this man-
ner: A track about three feet wide ran along in front
of the retort wall and parallel to it. A truck carry-
ing a sheet iron tank, and termed a "buggy," was
pushed along this track until it was in front of the
retort. When thus located the tank or buggy was not
close enough to the retort wall for the spout to reach
it, and to conduct the soup from the end of the spout
to the buggy, an open trough, like one-half of a stove
pipe, was placed under the spout, one end resting on a
projection in the retort wall and the other end resting
on the edge of the buggy, which also was open and
more than large enough to hold the residue from one
charge. When this tank or buggy was in place it was
about four feet high, four and one-half feet long, and
three and one-half feet wide. In cooking, a crust forms
by crystalization where the contents of the retort come
in contact with the mud, and this crust is sufficient to
hold back the soup for at least the short time occupied
in removing the mud ball. With the buggy in front of
the spout and the open trough in place, the operator
then takes an iron rod and makes a small opening in
the lower edge of this crust through which the soup
flows and, in doing so, crumbles or dissolves the re-
mainder of the crust so as to leave the diameter of the

tube free and clear, and the soup runs out into the buggy. The soup is not only intensely hot but it possesses highly poisonous and corrosive qualities which make it attack and destroy flesh whenever it comes in contact with it. There are also disagreeable fumes arising therefrom and some steam as it first emerges, and the operator, after making the small opening in the crust, would immediately withdraw his bar and go to the door behind him to escape the fumes, letting the soup flow out of the tube into the open trough and thence into the tank or buggy. Ordinarily the soup ran out in ten minutes.

At the time of plaintiff's injury, which occurred about six o'clock in the evening, he had cooked the charge for twelve hours when the indicators showed him it was finished, and the residue was ready to be drawn off. He proceeded to do so in the usual way by placing the buggy and trough in position and removing the clasp and collar on the outlet pipe. He then pried loose with his rod the mud stopper, getting it all out; and this dried mud was caught in a shovel by his assistant and carried away. Plaintiff then made the usual small opening in the lower edge of the crystallised crust and the soup started to flow in a small stream and he went and stood in the doorway. After standing there awhile he discovered that only about half of the soup had run out and the flow was not running as it should. He went back to his place in front of the retort and again thrust his bar in the outlet tube and discovered that there was an obstruction therein. In loosening this obstruction his rod went past in and into the pot until he was up to the buggy or at least close enough to it to have one hand over the edge thereof. Before he could withdraw the rod a portion of the obstruction, which felt to him like a piece of brick or rock, came out of the tube, dropped into the open trough and from there fell into the tank causing the soup therein to splash up into his eye. He in-

stantly dropped the rod, clasped his hands over his eye and called to his assistant to lead him out, which the assistant did.

Although the petition charged many acts of negligence, the case was finally submitted on two grounds only. One, the negligent leaving of debris in the retort, and the other, the failure to provide a cover for the buggy. Plaintiff secured a verdict and defendant appealed.

It seems that retort number 7, being the one plaintiff was operating at the time he got hurt, had stood idle for two years. It had been put back into use only the day before the accident on account of the wearing out of the other retorts. So that plaintiff had worked at number 7 and had drawn therefrom but one charge and that on the day before he was injured. There was substantial evidence tending to show that these retorts stood open when unused and that when they remained so for a time, dirt, dried mud, and debris would fall into them through the manhole in the top; that any soup left in a retort, in time, hardened into lumps like rock or concrete, some of which would melt upon the application of heat but some would not; that the pipes and fire box of number 7 were repaired by the defendant just before plaintiff was put to work firing a charge therein, and this workman peering into the manhole saw that there was scale and debris in the bottom to the depth of about one and one-half feet.

These retorts were so walled over with brick as to prevent plaintiff from seeing into them, and it was not his business to examine a retort before using it. But it was necessary for the defendant to have an unused retort gone over and such scale and debris removed before it could be used.

Plaintiff was told by Tansey, the foreman, to use number 7, but not to do so until another employee over him, Mr. Kemper, told him it was ready. Retort number 7 was repaired in its pipes and fire box, but no

debris was cleaned out of it nor was any inspection made of it to see whether it needed cleaning. Plaintiff knew nothing of this, being engaged in firing on another retort. On the day before the accident plaintiff was told by Kemper that retort number 7 was ready, and plaintiff began to use it. It took three hours and a half longer than usual to cook the charge on that day. This is mentioned as a circumstance tending to corroborate the evidence that there was a hardened cake of old soup in the bottom of the retort. But on the day of the injury it did not require more than thirty minutes longer than usual.

There was evidence tending to show that the outlet pipe or spout was eaten or rusted out and this had a tendency to cause an obstruction to become lodged therein. It was further shown that plaintiff had never observed any obstructions in the soup before and had never seen it splash; that he left no mud in the outlet pipe at the time he opened it to let the soup out and that he had not dropped any mud into the opening on top. Defendant's superintendent, Key, testified that it was Foreman Tansey's duty to get retort number 7 read to work, to see that it was safe to use; that there was danger of soup splashing up in plaintiff's face and that plaintiff had to get out of the way; that in order to get the soup to running, plaintiff had to stand in front of the opening and open it with his rod, and that there was no other way for him to do so, and that he expected him to get out of the way before the soup could strike him. Plaintiff testified that he was told that retort number 7 was ready and that there was no danger.

It is contended by appellant that respondent is not entitled to recover and that the demurrer to the evidence should have been sustained. One ground of this contention is that there was no evidence of any debris being left in the retort other than that left by plaintiff himself the night before. But the evidence showed that

soup left in for so short a time only would not be so
hard nor have the same appearance as it would if left
for a much longer period, and that the next morning
after the accident a chunk of very old debris was found
in the pipe and in the retort; and this, with the further
evidence herein before recited, clearly shows appel-
lant's claim in this regard to be wholly untenable. The
jury having found a verdict for respondent, we must
accept the evidence in his behalf as true together with
all legitimate and reasonable inferences to be drawn
therefrom.

The same thing may be said of appellant's claim
that the leaving of debris in the retort was not the prox-
imate cause of the injury. Unless plaintiff himself was
so negligent as to make his conduct the proximate
cause, the question whether the act of defendant, in
allowing debris to remain in the retort was the proxi-
mate cause, was certainly for the jury. Appellant
argues that the soup must have come out under great
pressure and therefore necessarily caused a splash in
the buggy whether there were any lumps or obstruc-
tions in it or not, and therefore it was the splash and
not the obstruction that did the injury. But under ap-
pellant's own evidence the employee had opportunity
to get away before the splash came caused by the
first outrush of the soup when the pressure was re-
lieved; and it was the presence of the obstruction neg-
ligently left there which required plaintiff to return to
his post. Besides, this overlooks plaintiff's evidence
that he had never observed the soup to splash before
or that there were obstructions to clog it up. This ab-
sence of splashing to which plaintiff testified had ref-
erence to after the pressure had been relievd and the
soup had begun to flow into the buggy for, according
to the usual method as testified to by all parties, the
operator was not there when the soup reached the
buggy but would go to the door to avoid the fumes.
And the jury might well infer that the soup did not

run with such rapidity and irresistible force as defend-
ant would have us believe, else the operator could not
be quick enough to get away as defendant claims he
must do to avoid the splash.    Under the evidence in this
case the splash which caused the injury was in turn
caused by the obstruction which was the result of ap-
pellant's negligence and therefore it is the proximate
cause of the injury.    At least it was for the jury to say
whether or not such were the facts.

The other two grounds most earnestly urged by ap-
pellant in support of its demurrer to the evidence, are
that plaintiff's own negligence contributed to or proxi-
mately caused the injury; and that he assumed the
risk.

The first of these is based upon these facts; That
there was a space of eleven feet between the retort
wall and the wall of the building behind the operator;
that the defendant furnished plaintiff with a rod nine
feet long with which to open the outlet pipe and that
plaintiff put his face so near to the retort outlet and
so close to the buggy as to really cause the injury him-
self, and was therefore guilty of contributory negli-
gence as matter of law.    This claim, when analyzed,
really means that plaintiff, instead of taking hold of
the end of his nine foot rod and standing back away
from the buggy and outlet so far as he could, must have
seized hold of the rod nearer its point and stood near
the buggy with his face unnecessarily close to the
fiery liquid in utter disregard of his own safety, and
that it was a position no reasonably prudent man, mind-
ful of his own safety, would have taken.    But this
view that plaintiff got nearer the retort than was re-
quired by the length of the rod is but a deduction from
the evidence as appellant sees it.    The truck on which
the buggy sat was two feet or perhaps more from the
retort wall and the buggy was three and one-half feet
wide.    Now the plaintiff's evidence clearly shows that
in pushing the rod against the obstruction in the pipe

it went past it and into the retort or at least it went
in until the plaintiff came near enough to the buggy
to have his hand over the edge of it. Appellant says
plaintiff leaned over the buggy but there is no evidence
that he did so, and there is room for the inference that
he did not, if the yellow steam and noxious gases were
coming therefrom, so irritating to the nose and throat,
as the evidence shows it to be. That the rod must have
gone into the retort is shown by the fact that plaintiff
said the contents in the bottom were much thicker than
usual and were like sand. The rod was nine feet long
and if it reached only to the retort, nearly six feet of
the rod were past the outside edge of the buggy leav-
ing plaintiff only three feet in which to secure a hold
on the rod and use the force necessary to dislodge the
obstruction. If, however, the force exerted upon the
rod was sufficient to cause it to go past the chunk or
piece of hard substance in the pipe and into the re-
tort, then this would bring plaintiff up to the edge of
the buggy as he says he was. It is true plaintiff, on
cross-examination, testified that his face was about
three feet from the end of the outlet, but this was not
given as an exact or precise distance. There were
no measurements taken by him. He was busy with his
work and took no accurate notice of his position. And
his answers show he gave all distances as mere approx-
imations. In fact the distance of three feet was con-
tained in the questions put to him and his answers were
"It might have been, yes sir," and "about that I
guess." Even if the force exerted by him upon the
rod made it slip past the obstruction so as to cause
his head and body to go forward until it was over the
buggy and within three feet of the end of the outlet pipe,
it is difficult to see how it could be said, as a matter
of law, that he was guilty of contributory negligence.
He had to get the soup out of the retort, he had to
stand in front of the pipe to do so; there was no other
place for him to stand and no other way to do his work.

Nor was he cognizant of the peril that confronted him as appellant claims. He did not know of the debris in the retort nor of the likelihood of a lump thereof causing a splash until after he had inserted his rod, when it suddenly came forth and did the injury. Appellant has by no means conclusively shown that plaintiff was possessed of two ways of. doing a thing, one safe and the other dangerous, and that, knowing the dangerous situation, he voluntarily chose the latter and did something no reasonable prudent man would have done under the same circumstances. We are possessed of no means of measuring the situation with such exact and mathematical nicety as to be able to conclusively say where plaintiff was when he got hurt, or that, in the few feet left to him, in which to work out the unknown problem which presented itself and to make the bodily exertions required to perform his duty, he got an inch or even a few inches closer to the liquid than he should have done and is to be deprived of all remedy on that account. The question was preeminently one for the jury to pass upon.

The same observations apply to the contention that plaintiff must be denied recovery on the ground that he assumed the risk. This feature of the case calls for a short statement of what the evidence tends to show as to the duty of the appellant, in the exercise of ordinary care, to provide a cover for the buggy.

It was shown to be easily possible and quite practicable to provide the buggy with a top having a hole into which the spout conducting the soup could be inserted so as to eliminate the splash entirely or render it harmless. There was also ample evidence tending to show that all other nitric acid plants throughout the country, using buggies to remove the soup, provided covers therefor, with the exception of one small plant and that had been modelled after appellant's plant. There were plants that did not use buggies but had open shallow pans. These, however, were placed down

on the ground much lower than the buggies and therefore further from the operator's face, and, in those cases, the spout extends from the retort down to and inside of the pan, thereby allowing no open fall of the soup to cause a splash. So that, where buggies are used, covers were in general and ordinary use, and where buggies were not used other precautions were adopted which performed the same office as covers. It seems that this soup is conveyed to another department where it is again used in the making of muriatic acid, and, in doing so, it has to be heated again. The advantage in using a buggy is that the soup can be conveyed at once and while it is still hot, thus saving the necessity of raising it to that temperature again, while, in the use of pans, the soup is allowed to cool and harden and then is broken up and shovelled out and must be reheated.

Appellant complains that the admission of testimony as to what was in use in other plants was error. But it was not admitted for the purpose of showing that a safer method was available and might have been adopted, nor was it introduced to show that appellant's methods were not the best known or best obtainable. The evidence was admitted as bearing upon the question whether the employer had exercised reasonable care in the selection and choice of its methods and instrumentalities. The petition alleged, and the evidence showed, that the business was exceedingly dangerous owing to the highly caustic nature of the materials worked with. One of the great limitations upon the doctrine of assumption of risk is the principle that the employer must exercise reasonable care in the selection of his instrumentalities. His methods as well as his appliances must be reasonably safe. [3 Labatt on Master and Servant (2 Ed.), secs. 917, 928, 930.] A servant does not assume risks caused by his employer's negligence. He only assumes the risks which are liable to happen on account of the nature

of the employment when the master has used reasonable care to avoid that result. [Curtis v. McNair, 173 Mo. 270.] Plaintiff certainly did not assume the risk or extra hazard caused by the negligent permitting of old and hardened soup to remain in the retort. With appellant's method of removing the soup, which allowed it such a high fall from the end of the trough, it was reasonably likely to splash, and if there were chunks or rocks therein, it would be absolutely sure to do so. Now, the fact that all other makers of nitric acid, excepting one patterned after appellant's plant, used a buggy with a cover, or, if they used some other means, adopted precautions which obviated the danger from splashing as effectively as a cover would have done, is evidence tending to show that appellant did not exercise the ordinary care required of it so as to enable it to claim the benefit of the doctrine of assumption of risk. [Gordon v. Kansas City Southern Ry., 22 Mo. 516, l. c. 536; Schiller v. Kansas City Breweries Company, 156 Mo. App. 569, l. c. 577.] It is those risks alone which remain after the employer has exercised ordinary care that the servant assumes. [George v. St. Louis & San Francisco R. Co., 225 Mo. 364, l. c. 408; Gummerson v. K. C. Bolt and Nut Co., 185 Mo. App. 7, 171 S. W. 959; Choctaw etc. R. Co. v. McDade, 191 U. S. 64, l. c. 66; Texas etc. R. Co. v. Archibald, 170 U. S. 665.]

The plant was located in Kansas and the cause of action arose in that State but that makes no difference since there is no substantial difference between the doctrines on this subject laid down by the courts of that State and this. [Electric Plaster Co. v. Reedy, 74 Kansas 57, l. c. 65; Wurtemberger v. Metropolitan St. Ry. Co., 68 Kansas, 642; Hoffmeier v. Kansas City etc. R. Co., 68 Kansas, 831; City of Emporia v. Kowalski, 66 Kansas, 64; Goodeye Mining Co. v. Robinson, 67 Kansas, 510.] Our courts have heretofore held there

was no difference. [Charlton v. St. Louis etc. R. Co., 200 Mo. 413.]

Other complaints are made with reference to the admission of testimony and the giving and refusing of instructions. We have carefully examined each and find they are without merit. The petition contained the allegations of negligence upon which the case was submitted, and plaintiff's instructions followed the issues raised by the pleadings.. The most serious objection made to plaintiff's first instruction is the claim that it made defendant's liability for failure to cover the buggy depend upon whether it was practicable to cover it. But an examination of the instruction will show that it submitted to the jury the question whether the work was dangerous to plaintiff on account of the likelihood of the soup splashing into his eye and whether "ordinary care required that said buggy be provided with a cover" etc. The instructions given in defendant's behalf presented every phase of the case from it's standpoint. Those refused were either erroneous in some particular or presented a theory of law in conflict with what is hereabove announced.

Improper argument on behalf of plaintiff is complained of. The first impropriety objected to was where plaintiff's counsel in speaking of the negligence in directing plaintiff to use a retort which had debris in it without inspecting or cleaning it, referred to it as "criminal neglect." But when objection was made, the remark was withdrawn and the court, in obedience to defendant's request, told the jury to disregard it. Counsel for plaintiff in resuming his speech said he would "let the jury pass on the conduct of the defendant about that." Objection was made to this, and again the court told the jury such remarks were improper and should be disregarded. In closing, plaintiff's counsel told the jury they had no right to specu-late about their verdict as to what would become of it or as to what was going to be done with it; that their

duty went no further than to render a verdict, and he asked the jury to give plaintiff "the reasonable value of his eye." This was objected to and the objection was overruled. We see no reversible error here. If it was improper to make the first remark above noted, it was upon objection withdrawn and the court sustained the objection and told the jury to disregard it. This cured any error that may have existed. [Torreyson v. United Railways, 164 Mo. App. 366; State v. Brandenberg, 118 Mo. 181.] With reference to the second objection, we fail to see any impropriety in it, certainly none sufficient to call for a reversal. The argument was not upon something outside the record. Nor was it an appeal to the jury to return a verdict for reasons they should not entertain, nor did it tend to rouse the prejudices of the jury. It was wholly unlike that in Burnes v. St. Joseph, 139 Mo. App. 545. Instead of asking the jury to act upon improper motions, it tended rather to the opposite, since it appealed to them to consider the duty that was before them and nothing else, rather than something about which they knew nothing and over which they had no control.

Lastly it is urged that the verdict is excessive. We are not warranted in saying so. The corrosive liquid attacks and burns human flesh with a poisonous, ulcerating effect, exceedingly hard to cure and causing excruciating pain. The pain was so great that plaintiff walked the floor all night and suffered much agony for ten days and then in a less degree for several months. The lids of his eye were swelled to twice their normal size and turned inside out causing the whole eye to look like a piece of raw meat or a clot of blood. Although it is not expressly so stated in the record, yet we assume that this raw appearance has somewhat decreased, and there is evidence that it will disappear in time. But the eye is shrunk in size and the tissues thereof have broken down. And when the

eye is exposed to the wind it becomes bloodshot and red. The sight of the other eye is sympathetically affected to some extent, and plaintiff cannot read for more than a few moments at a time. Prior to his injury plaintiff was in the railroad service and had excellent sight. We are not justified in disturbing the verdict.

The judgment is affirmed. The other judges concur.